## Case No. 13,949.

### THOMPSON et al. v. The CATHARINA.

[1 Pet. Adm. 104.] [1]

District Court, D. Pennsylvania. 1795.

ADMIRALTY JURISDICTION—MARITIME CODES.

1. Laws and principles which govern the maritime courts of the United States.

[Cited in The Jerusalem, Case No. 7,293; Bains v. The James and Catherine, Id. 756; U. S. v. New Bedford Bridge, Id. 15,867; Waring v. Clarke, 5 How. (46 U. S.) 473; Bucker v. Klorkgeter, Case No. 2,083; The Comet, Id. 3,050; The Becherdass Ambaidass, Id. 1,203.]

2. This court must be governed by the Maritime Code we possessed before the Revolution, where not altered by law or by a change of circumstances.

3. Parties may mould their contracts at their pleasure, in cases not against common justice.

This was the case of a foreign ship, which came before the court on a claim for wages by her seamen [Thompson, Jacobson, and others], who by their contracts had engaged to return to the port from which they shipped. During the progress of the cause, the following opinion was given by the district judge.

"An objection is made, though not very seriously pressed, to my decision on a point, on which our own municipal laws are silent. This objection, however, obliges me to give my sentiments on the question, 'What laws or rules shall direct or govern the decisions of maritime courts here, in points on which we have no regulations established by our own national legislature?' There are, in most nations concerned in commerce, municipal and local laws relative to contracts with mariners, and other maritime covenants and agreements; though the great leading principles, or outlines, are in all nearly the same. On this account among others, I have avoided taking cognizance, as much as possible, of disputes in which foreign ships and seamen, are concerned. I have in general, left them to settle their differences before their own tribunals. On several occasions, I have seen it part of the contract, that the mariners should not sue in any other than their own courts;—and I consider such a contract lawful. It would be against law, and void, if it were, that the mariner should not sue in any case; or, that he should not sue in the proper court, or courts of his country. But where the voyage of a foreign ship ended here, or was broken up, and no treaty or compact designated the mode of proceeding, I have permitted suits to be prosecuted. In such cases, I have determined according to the laws of the country to which the ship belonged, if there existed any peculiar variance or difference from those generally prevailing. I have seldom found any very material difference in principle. The laws and customs of

[1] [Reported by Richard Peters, Jr., Esq.]

Spain,[2] relating to mariners, are more rigid than those of other nations, on similar points. Among other points of variance from other laws, those of Spain grant the master, a lien on the ship, for his wages. In the present case, the contract was in part, with mariners of the United States; and these seamen were to be discharged in an American port. I apply the authority of this court to the case of our own citizens. If by our own municipal laws, there are rules established, our courts are bound exclusively to follow them. But in cases where no such rules are instituted, we must resort to the regulations of other maritime countries, which have stood the test of time and experience, to direct our judgments, as rules of decision. We ought not to betray so much vanity, as to take it for granted, that we could establish more salutary and useful regulations than those which have, for ages, governed the most commercial and powerful nations, and led them to wealth and greatness.

The laws of the Rhodians were followed and adopted by the Romans, in their most prosperous state of commerce and power. Those in the celebrated Consolato del Mare,[3]

prevailing in the Mediterranean, and established, in concert with other trading states and countries, by the Venetians and Genoese, in the periods of their naval power and commercial prosperity, are collections of, and improvements on, more ancient customs and laws. Of these, the Amalfitan Code (the first and most respected of what are called, as they relate in point of time to those of the Rhodians and Romans, "Modern Sea Laws,") furnished the predominant and most generally received principles.[4] The laws of Oleron, occupy now a portion of the famous Black Book of the British Admiralty, which is consulted by all their courts on subjects of maritime and commercial controversy. These laws of Oleron were not entirely of British growth. They were compiled at first, as French authors assert, and from the face of them it would seem probable, by Queen Eleonora, Duchess of Guienne, for her continental dominions, and afterwards improved and enlarged by her son Richard the First, of England, in no small degree from the maritime laws and customs, not only of his own country, but also from the laws and customs prevailing among the continental trading nations. Of these, the Saxons were, at an early period, the most conspicuous and practically intelligent in nautical affairs. They introduced into England their maritime knowledge, as they did some valuable principles of the common law. What was entitled, the Saxon shore, extended from the western parts of Denmark, to the western parts of France. The excellence and importance of these laws of Oleron, are evinced by a contest for their origin between two great nations, who have wisdom and liberality enough to follow them, be the fact of origin how it may. The maritime ordinances of France (where also the laws of Oleron, or Roll d'Oleron, are in force, and claimed, as of French origin) are

---

[2] Spain cannot be said to have a general national code. She possesses a number of local collections and ordinances, operating in different maritime districts of that extensive kingdom. 1. Their civil law, consists of a great number of particular laws compiled in the form of codes. 2. Each has particular titles. See 1 Azuni, Mar. Law, pp. 404, 405. 3. The Consolato del Mare, is an adopted code, and governs in the Spanish courts of the Mediterranean. 4. The laws and ordinances of the Consulate of Bilboa, prevail on the Spanish coasts of the Atlantic. 5. The commerce of the Indies is regulated by a particular code, distinct from others. It is governed by, and subjected to, the usages of the Contractacion; or Consulate of Seville. See Azuni, of whom, in addition to many more ancient writers, I have made much use on those subjects.

[3] Il Consolato del Mare. These are the most ancient, celebrated and authentic sea laws, after those of the Rhodians, Greeks, and Romans. Yet Hubner, because he found (as Emerigon alleges), a passage in them contradictory to a favorite dogma, vituperates and deprecates them, to his own disgrace, and not to their disparagement. As a respectable part of the laws of nations, they have always been received in the English courts of admiralty, and those of this country. Their origin is enveloped in obscurity, though attributed to several nations, as well as to the Pisans, to whom a modern author labours to ascribe them. Their influence, value and authority, have been appreciated by claims to their origin, set up by various people of maritime countries. Those laws have prevailed in the countries occupying the coasts of the Mediterranean, and in the neighbouring parts of Southern Europe, for centuries. Although some special and local laws exist, in several national districts of that region, yet the Consolato del Mare is, to this day, the leading directrix, in their maritime jurisprudence, and naval affairs. This body of maritime law is a compilation "of the best maritime laws then existing, comprising judicial proceedings, principles and decisions, settled by men of great experience and consummate prudence; who, having reason and custom for their guides, established these excellent regulations, concerning navigation and

maritime contracts." It may, indeed, be called the "Common Law of Maritime Europe," where it is universally adopted and respected.

[4] The city of Amalfi was situate in, what is now called, the province of Salerno, in the kingdom of Naples. Nothing great remains of it, but its celebrity for the most extensive commerce of its time, its immense wealth and magnificence, and its great weight in all questions of maritime concern. Like the Rhodians, the Amalfitans furnished principles for the codes of other maritime countries of Southern Europe. These remain engrafted into the laws of other nations; though the Amalfitan Code, or, as it is sometimes called, "Table," is not preserved. To the Amalfitans, the invention of the mariner's compass is ascribed. Dr. Robertson gives the discovery to a native of Amalphi. But no opinion about ancient transactions, seems to be at rest. Azuni says, the French invented—the Amalfitans improved—and the Portuguese perfected, this compass, in their discoveries of the New World. The Chinese forestall the whole, in the antiquity of their claims, to this most eminent of all useful inventions. The Pisans and the Amalfitans share the credit of the discovery and preservation of the Pandects of Justinian, after their having been long buried in obscurity, during the barbarous ages.

very much grounded on the sea laws of other nations, mixed with their own. Those of Louis the Fourteenth, were compiled under the direction of the great minister Colbert, from such materials, with local additions, suited to that country. The laws of the Hanse Towns,[5] are nearly in substance the same with those called the laws of Wisbuy, and both are principally founded on those of Oleron. The sea laws of Spain are. in no small degree, collections from those of other nations. There is a striking similarity in the leading principles of all these laws. So far from sound principles becoming obsolete, or injured by time, that it will be found, on careful investigation, that the oldest sea laws we know, those of the Rhodians,[6] have furnished the outline and leading character of the whole. With such examples before us, we need not hesitate to be guided by the rules and principles, established in the maritime laws of other countries. As the ocean is common, it is proper and essentially convenient, that its laws should be also common to all who travel this "high road of nations."

I shall not contend with those who say, we ought to have a maritime code of our own, about the binding force of all these laws on us. By the general laws of nations we certainly are bound. These apply, most frequently, in the prize court; but there are many cases of salvage, wreck, &c. on the instance or civil side of the court, which necessarily must be determined under the general law. The wisdom and experience, evidenced in the particular maritime institutions of other commercial countries, ought at least to be greatly respected. If they serve only as faithful guides, and tried and long established rules of decision, in similar cases, they are of high and exemplary importance. It must be granted, that it is safer to follow them, than to trust entirely to the varying and crooked line of discretion.[7]

Where a reciprocity of decision, in certain cases, is necessary, the court of one country is often guided by the customs, laws, and decisions of the tribunals of another, in similar cases. But the change in the form of our government has not abrogated all the laws, customs and principles of jurisprudence, we inherited from our ancestors, and possessed at the period of our becoming an independent nation. The people of these states, both individually and collectively, have the common law,[8] in all cases, consistent with the

---

[5] The laws of the Hanse Towns were published first in 1591, and reviewed in 1614, and posterior to those of Wisbuy or Oleron. The history of this commercial confederacy is well known. Although in itself and its dependencies, it consisted of 62 cities, originally, it is now reduced to six, consisting of Lubeck, Hamburgh, Dantzig, Bremen, Rostock, and Cologne. Its existence to this day, in any state of respectable combination, is a singular instance of survivorship over the ravages of time, the jealousies of powerful nations, and the exposure to interior danger and dissension; to which all multitudinous associations, whether national or individual, are constantly, often fatally, liable.

[6] In a note to the case of Walton v. The Neptune [Case No. 17,135], it will appear, that Azuni, in his book on Maritime Law collects all the authorities for and against the authenticity of the fragments of Rhodian laws, published by Simon Scardius and others, and continued to our time, in collections of sea laws as genuine. Azuni declares them spurious. But although, according to him, these may not be genuine, as to the text and very words (which other respectable writers either impliedly or positively assert they are) they contain many of the principles we see in other codes and works. Azuni allows, agreeably to a cloud of authorities he could not controvert, that "the Rhodian Laws, whatever may be the period of their publication, are the fountain of maritime jurisprudence." 1 Azuni, Mar. Law (New York Ed. 1806) 277. The Rhodians applied themselves exclusively to commerce, and avoided every idea of extension of territory. Their fleet was so powerful, and their naval regulations so excellent, that they were courted by the most mighty nations of their time They held the empire of the sea, and by confining their strength and resources to maritime objects, they not only protected and extended their own commerce, but scoured the ocean of pirates who annoyed the trade of all countries. Alexander the Great treated them with marked distinction. The Romans were their admirers, allies, and friends. These powerful islanders entitled themselves to the friendship and esteem of other commercial nations, by aiding and protecting, and not by restraining similar pursuits. Their superiority, in mercantile and naval talent and enterprise, gained them the admiration and respect of their contemporaries; when a spirit of monopoly, jealousy and plunder, would have handed them down to us, not to be imitated, but detested.

[7] The foregoing enumeration of some of the maritime codes, is not intended to comprehend the whole, which would swell the account too extensively. It is given merely to shew, that the most renowned maritime nations always adopted the principles, when long tried and tested, of their predecessors, or contemporaries. England has not collected into a body, or code, the maritime laws by which she deems herself bound peculiarly, though she has enacted some laws, in addition to the laws or judgments of Oleron; such as the statute De Mercatoribus, the articles of Quinsborough, the acts relative to the powers of the admiralty, her navigation act, prize acts, &c. Her law merchant, and that part of it relating to assurances particularly, as well as maritime law, are chiefly collected in the decisions of her courts. These are founded on usages and established customs, as well of her own, as of all countries possessing respectable codes or principles of maritime law. When they are duly canvassed, and have stood the test of time and sound discussion, they become part of their common law, and settled as precedents of indisputable authority. In their courts, respectable foreign jurists and publicists are cited, and their reasonings, opinions, and statements regarded, in the decision of maritime questions. Such has also been the practice in the courts, particularly of maritime jurisdiction, of our country. Holland, though its existence depended on commerce, has never had any peculiar national code of maritime laws,—possibly owing to the division of her territory into separate provinces.

[8] The feudal parts of this law, and such as are inconsistent with the principles of our government are not, nor can they be, in force. Those who are best acquainted with its wise and just principles, as they relate to contracts, and the property, as well as the personal rights of individuals, admire the common law as the

change of our government, and the principles on which it is founded. They possess, in like manner, the maritime law, which is part of the common law, existing at the same period; and this is peculiarly within the cognizance of courts, invested with maritime jurisdiction; although it is referred to, in all our courts on maritime questions. It is, then, not to be disputed, on sound principles, that this court must be governed in its decisions, by the Maritime Code we possessed at the period before stated; as well as by the particular laws since established by our own government, or which may hereafter be enacted. These laws and the decisions under them, must be received as authorities, in this, and other courts of our country "in all cases of admiralty and maritime jurisdiction," to which, by the constitution, it is declared "the judicial power of the United States shall extend." Nor shall I think myself warranted to exclude more modern expositions, or adjudged cases from being produced here. Whatever may, in strictness, be thought of their binding authority, I shall always be ready to hear the opinions of the learned and wise jurisprudents or judicial characters of any country. On subjects agitated in this court, often deeply affecting the property and reputation of the suitors, I am not so confident in my own judgment, as not to wish for all the lights and information, it may be in my power to obtain, from any respectable sources. If, in any instance, the laws or the decisions under them, shall be found or deemed severe, or not suited to a particular exigency or course of trade, parties may mould their contracts at their will, according to circumstances, by mutual agreement and consent. Let the law be what it may, "modus et conventio vincunt legem," in all contracts, not radically against common justice, moral and political obligations, and those principles which the law will not suffer to be destroyed or perverted for private purposes.[9] If un-

der a contract, by a casualty, a particular inconvenience arises from the general principles of the maritime law, the party must submit. He must consider what he loses or pays as a contribution to the great and general interests of commerce, or the predominant policy and advantage of his country.[10]

---

venerable and solid bulwark of both liberty and property. Statute laws innovating upon it, have seldom been found, on experience, to be real improvements. Those who do not know the common law suppose it to be everything, that it is not. Its rules and principles are not arbitrary, but fixed and settled by the wisdom and decisions of the most respectable and intelligent sages, of both ancient and modern times. Many of the objections raised against it shew a want of acquaintance with its system and principles. Some of these objections are founded in innovation made by statutes altering or obscuring, the common law. Others have nothing in either common or statute law to support them.

[9] The conditions of bonds, or considerations of promises, or agreements in contracts accounted illegal and void, are numerous and well known to lawyers. A contract cannot be legally binding which defeats its own object—such as that no suit shall be brought at all for a bona fide debt, agreed to be paid—a condition in a deed to do an act malum in se, as to beat, or kill a man, or commit any crime—insurance on a illegal voyage—bonds for general restraint of trade are void, though good where the condi-

tion is not to carry it on in any particular place —a bond to a third person that the obligor, a witness, shall not prosecute one confined for felony, perjury, &c. and many other instances which might be given. A bond with impossible conditions is absolute, and the condition a nullity. An agreement or contract not to bring a suit to enforce performance is, if made at the time, well. But if made posterior to the bond, contract or agreement, it amounts to a general release.

[10] The cause, in which the foregoing opinion was delivered, was of a mixed character. Part of the complainants were foreigners, and bound to return home with the ship, although with a view to sail out of our port, at our high wages, they endeavored on pretext of deviation, to obtain their discharge. The cause was dismissed as to them—they were referred to their own courts for decision. Wages were decreed to two American seamen, who were by contract to be discharged here. In the case of Willendson v. The Försöket [Case No. 17,682], the principles adopted by the court, relative to foreign seamen, are further elucidated and explained.

