## Case No. 4,427.

### The *ELWIN KREPLIN.*

[4 Ben. 413.] [1]

District Court, E. D. New York. Dec. 1870. [2]

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Reversed in Case No. 4,426.]

D. McMahon, for libellants.
E. Salomon, for claimant.

BENEDICT, District Judge. This is a cause of subtraction of wages, instituted by Max Newman, who was the chief mate of the Prussian bark Elwin Kreplin, to recover the sum of $173, being the amount of his wages earned in the capacity of chief mate of that vessel; and also the sum of $1,158, which is the aggregate amount of the wages of the crew, which he claims to recover as assignee of the seamen. A statement of the facts in proof is necessary to an understanding of the many questions raised.

The time of service and rates of wages are not disputed. The libel concedes the term of service for which the men were shipped to have been two years, which has not yet expired.

This term of service being admitted in the libel, is to be taken as proved, although it is not entirely clear from the agreement itself that such was its legal effect. In the prosecution of her voyage, the brig arrived in this port, and, war having broken out between Prussia and France, she was compelled to lay up here to wait for peace. She was accordingly laid up at Staten Island, and while there the difficulty arose which gave rise to the present litigation. It appears that on the morning of the 1st of August, 1870, before breakfast, the master undertook to chastise the cabin boy, in the cabin. The boy's cries being heard by the crew, who were at work on deck, they went in a body into the cabin, and challenged the right of the master to chastise the boy. The master thereupon desisted, and the men returned to their work on deck. The master soon followed, and an altercation ensued between the master and crew, in which various complaints were made, and some vile epithets applied to the master by the mate, who was not in the cabin with the men, but in the altercation on deck took part with the crew. During the dispute, the men, in a body, demanded permission to go before the consul with their complaints. Permission was given to one named Lutte, and perhaps to Martens also. The permission to Lutte is conceded by the master, but permission to Martens is denied. Upon permission being given to Lutte, the crew cried out, "We will all go." When the dispute ended, the captain went to his breakfast, and after breakfast went ashore, to obtain, as he says, the aid of the police, on account of the mutinous condition of the crew. After he was gone, the crew, having finished cleansing the decks, and eaten their break-fast, dressed and informed the mate, then in command, that they were going to the consul, and went ashore. No objection was made by the mate, beyond a suggestion that they had better wait till the captain returned. Soon after the men had left, the captain returned, but without any police, and was informed by the mate that the crew had gone ashore. Words thereupon passed between the captain and mate, which resulted in the mate's saying, "I will go too," whereupon he also left, without any objection by the master. On leaving the ship, the mate proceeded to the ferry leading to New York City, where the office of the Prussian consul is located. The rest of the crew appear to have followed the carpenter, who went to the police station to enter a complaint against the master for beating the boy, in whom the carpenter, doubtless, took more interest than the others, as he came from the same town in Germany. The master soon appeared at the police station, and shortly after at the ferry house, with a policeman. The mate, at their request, accompanied them to Justice Garret, a police justice of the village of Edgewater. There the captain made a complaint against the whole crew, including the mate, for mutiny and desertion, but was informed by the justice that he was without jurisdiction, and that application must be made to the United States courts. The justice, however, was afterwards induced to direct a policeman to take the men into custody, if he would do so at his own risk. This the policeman did, and the mate and men were then locked up.

The master next proceeded to the consul's office, and there made complaint in writing, of which a protocol was made, describing the occurrence of the morning on board the ship, and stating that the men were then in custody on Staten Island, and ending as follows: "I request of the consul-general the punishment of the entire crew, especially of the mate, Newman, who has instigated the complot. Since my life is not safe, I request that the entire crew be kept in custody preliminarily; and, under existing circumstances, I cannot again take the mate on board."

The consul thereupon issued a requisition, the substance of which has been proved, in the absence of the original. To whom this requisition was addressed is not certain. Justice Garret thinks that it was addressed, "To Any Marshal or Magistrate of the United States;" but it was written on a blank, which was addressed in print, "To the Commissioner of the Circuit Court of the United States for the        District of New York," and it is not shown that the blank address was altered or filled up. This requisition, after referring to the treaty with Prussia stipulating for the return of deserting seamen, and authorizing the consul to require the assistance of the local authorities for the search, arrest and imprisonment of deserters,

represented that these seamen, naming them, and including the mate and Lutte, had deserted from this vessel on that day; that the consul made application for a warrant to the marshal of said district to cause the men to be arrested, and "if said charge be true," that they be detained at the consul's expense until there should be an opportunity to send them back. No action was taken by the consul in regard to the master's complaint, except to deliver this requisition to the master, who instead of presenting it to a U. S. commissioner, took it to Justice Garret, the next morning, and thereupon Justice Garret, without examination, committed all the men to the common jail of Richmond county, his commitment stating that it was upon the complaint of the master for desertion, and containing no allusion to the consul's requisition.

On the 9th of August the master desired a release of some of the men, and the consul appears to have directed a release of them all, but no order for their return to the ship was made by the consul or asked for by the master, nor was the production of the men before the consul directed.

On the 11th of August two policemen took the mate and three of the men from the jail to the consul's office, and were then directed to release them, and the men were advised to go on board and persuade the master to pay them their wages. The next day the remaining four were released from jail, and during the day all the men appeared at the consul's office. They were again advised to go to the ship and ask the master for their wages, but they had no money to pay their ferriages from New York to Staten Island. By putting all their means together, however, enough was found to pay the ferriage of three. Accordingly, the mate, the carpenter and Lutte went to the ship and saw the master. The mate testifies that the captain promised to pay him and appointed the next day to meet him at the consul's.

The master admits making the appointment and that he gave the mate his navigation book and entered in it the credits to date, but denies the promise to pay him. As to what actually took place at this interview, the witnesses differ, but the result was an arrangement to meet at the consul's office the next day. This meeting never took place. The men and the master appear to have been at the consul's during that day, but they failed to meet, although the master says that as he came down from the consul's he saw Torriff and Reischoff, two of the crew, whom he asked to return to the ship, and they laughed at him and said, "No! Not a bit of it." Subsequently this action was commenced. Upon these facts it is contended that these seamen are not entitled to recover their wages, admitted to have been earned in the service of this vessel, on several grounds.

Upon the merits, it is said that the wages have been forfeited by desertion.

The charge of desertion against the mate has no foundation. He left the ship openly without objection from the master, without taking any of his clothes, and with a remark, which, under the circumstances, was a notification that he was going to see the consul. He was shortly arrested and cast into prison and there kept during ten days of the extremely hot weather of last August, and then let out without a request or suggestion that he return to the vessel. Indeed the master had expressly declared that he should not return. It is vain to contend that these facts present any of the features of desertion, so far as the mate is concerned. With regard to Lutte, the case is still stronger, for the master concedes that Lutte asked and obtained of him permission to go to the consul. He also was in a similar manner imprisoned as a deserter. With regard to the other seamen the case is simply one of leaving the ship without permission. "It has been uniformly held that it is not desertion, for the seamen to leave the vessel against orders to go before the consul at a foreign port to complain of their treatment." 1 Pars. Mar. Law, 470, note. In this case the men did not take their clothes. When the master gave permission to Lutte to go to the consul, they announced their intention to go too. When they left they informed the mate, who was then in command (The Union [Case No. 14,347]), that they were going to see the consul. Upon the evidence, I find nothing to justify the master in supposing that the men were not going to the consul, and would not return to the ship at nightfall, and yet they were all at once arrested and cast into prison; and, so far as appears, without any prior request that they return to the ship. To hold such a leaving of the ship to be desertion is impossible. But it is said that when released from jail they refused to return to duty, and are therefore deserters. There is some evidence to this effect, but it is loose, and, upon a consideration of all the evidence, I am satisfied that the master never in fact communicated to the men either an intention to forfeit their wages or a desire to have them again in his service. As to the mate, he had expressly refused to have him on board. As to Kruise and Reischoff, he had, before the difficulty, given them to understand that they would be permitted to leave. He was half owner. His vessel was laid up to await the result of a great war— only the services of watchmen were required on board—and he had engaged two other men for that duty. He had, therefore, no reason to desire the return of the men, and, I am satisfied, did not desire it, although he may have been quite willing to make out a case of desertion, in the hope of saving the very considerable sum due the men; but his action was such as to lead the men to suppose that their leaving the service of the ship was acquiesced in, and such, it appears,

was the impression formed by the consul, for he says he told the men he was sure the captain would pay them their wages. I am, therefore, of the opinion that the connection of the men with the ship was severed by mutual consent, and consequently, they are entitled to their wages.

But if this be not so, I am of the opinion that the conduct of the master, in imprisoning these men, was unlawful, and sufficient to dissolve the contract of the mariners; and I apply to the case of these foreign seamen in an American port the same rule which our courts have applied in cases of the imprisonment of American seamen in foreign ports. The rule is stated as follows: "The practice of imprisoning disobedient and refractory seamen in foreign jails is one of doubtful legality. It is certainly to be justified only by a strong case of necessity. It should be used as one of safety, rather than discipline, and never applied as punishment for past misconduct." Wilson v. The Mary [Case No. 17,823]. In Jordan v. Williams [Id. 7,528], it is stated as settled, that it is not one of the ordinary powers of a shipmaster to imprison his men on shore.

The imprisonment inflicted on these men was without justification. The only excuse for it is the occurrence on the morning of the 1st of August, above detailed, which was not a very serious matter. The men were undoubtedly wrong in appearing in the cabin, and calling in question the master's right to punish the boy; for which, perhaps, there is some palliation in the fact, that, while the crew, doubtless, knew that by the Prussian laws, corporal punishment of seamen is not permitted, they may not have known, that, by the same laws, "ship boys are subject to the parental chastisement of the master." The punishment of the boy, in this instance, was not cruel, and the men could not complain of some punishment inflicted on them for their appearance in the cabin, and their disrespectful language afterwards on deck. But there was nothing alarming in the temper of the crew; there had been no difficulty with them before this, and nothing occurred on this day which any master of order, judgment, and firmness would not have easily dealt with. No weapons were shown, no blows struck, no threats made, except that of reporting to the consul, and, if punishment was thought necessary, it should have been inflicted on board, and not by imprisonment in a foreign jail.

Neither does the master stand excused, if it be considered to have been shown that he really thought the men had left the ship, with intent to desert, for his whole conduct was unlawful. No law permits the imprisonment of deserters in our jails, except on proof of the facts before a competent tribunal. The act of March 2, 1829 [4 Stat. 359], which is the only statute enacted to render effective the provisions of article 11 of the treaty with Prussia, requires an application by the consul, with preliminary proofs, before a magistrate having competent jurisdiction, and the warrant of such magistrate for the arrest. The seaman cannot be surrendered to the authority of the consul, until an examination be had before the magistrate, and the statement that the seaman is a deserter found to be true. And the arrest and detention of the seaman, in such cases, is not for punishment, but simply for safe-keeping until he can be sent back. Here the men were imprisoned, in the first instance, for a day and a night, upon the request of the master, without any of the preliminary proofs required by the statute, and without the interposition of the consul. And when, on the next day, the consul issued the requisition for an examination before a U. S. commissioner, the master took it to the police justice, where it was used, apparently by way of inducement, for the imprisonment was then continued for some ten days, upon the complaint of the master, and not by virtue of the requisition. This imprisonment was, in law, the act of the master. He caused it to be done by a magistrate, known to him to be without jurisdiction. Nor can he protect himself by saying that he acted under the direction of the consul. The consul made no requisition upon the police justice, and never requested that officer to imprison the men, and his requisition is not alluded to in the commitment. He did direct somebody to release them, but it is not shown what person, other than the captain and the policeman, he so directed. It is also true that he paid the jail-fees to the jailer, but there is evidence showing that this payment was for the account of the master.

If it be true, that a master is not responsible for an imprisonment inflicted by competent authorities, under the order of a consul (Johnson v. The Coriolanus [Case No. 7,380]; Wilson v. The Mary [Id. 17,823]; Jordan v. Williams [Id. 7,528]), it is also true that he is responsible for an imprisonment inflicted, at his request, by a police justice without jurisdiction in the premises (Snow v. Wope [Id. 13,149]).

In every aspect, then, the conduct of the master in respect to these men, was unlawful, and, it appears to me, without excuse. Three of the men who have appeared before me, are men of intelligence, and of truthful appearance. The mate appears quite the equal of the master, and is, in fact, his connection by marriage. The difficulty arose in a port where there was every opportunity for protection, and for lawful investigation, and there was nothing requiring haste. Such an imprisonment, under such circumstances, I consider sufficient, within the principles of the adjudged cases, to dissolve the mariners' contract, and sever the connection between the men and the vessel.

But it is said, that the men contracted not to sue in a foreign country, and, therefore, this action cannot be maintained. This po-

sition is based upon the words of the ship's articles or muster roll, which .declare that "the seamen hire themselves on the above-mentioned vessel in accordance with the legal regulations printed in the Book of Navigation." The Book of Navigation referred to is a book which is furnished to every Prussian seaman, and which contains the name of the holder, with a description of his person, and memorandum of every shipment and every discharge of the holder, signed by the mustering authorities. The book contains also a printed appendix, where may be found certain extracts from the German mercantile law, among which extracts is this provision: "The seaman is not allowed to sue the master in a foreign court." Assuming that this provision of law is incorporated into the agreement, by the words used in the articles, and, therefore, to be considered as part of the contract, which is not entirely clear, the first answer is, that the provision, by its express terms, is made to relate to suits against the master, which this is not. Another answer is, that the master having, by his unlawful conduct in violation of his contract, absolved the men from their agreement, has absolved them from the whole of it, and this portion with the rest. Shulenburg v. Wessels, 2 E. D. Smith, 71.

In the English courts, a foreign statutory prohibition of this description has been considered not enforceable, unless incorporated as part of the contract. Macl. Shipp. p. 226. In the American courts, it has been held that such a provision in the contract will not be enforced, "where the voyage, as respects the seamen, is put an end to" (Weiberg v. The St. Oloff [Case No. 17,357]), "where the interests of justice demand it" (Bucker v. Klorkgeter [Case No. 2,083]); and, "where the seamen are left destitute by an improper discharge" (Id.).

Again, it is said that this is a Prussian vessel, and therefore, the court is without jurisdiction in the premises by reason of the treaty between the United States and Prussia, ratified in 1828 (8 Stat. 382). This position, which has been urged upon my consideration with earnestness and ability, has received my careful consideration. The provision of the treaty is as follows: "The consuls, vice-consuls and commercial agents shall have the right, as such, to sit as judges and arbitrators in such differences as may arise between the captains and crews of the vessels belonging to the nation whose interests are committed to their charge, without the interference of the local authorities, unless the conduct of the crews or of the captain should disturb the order or tranquillity of the country, or the said consuls, vice-consuls or commercial agents should require their assistance to cause their decisions to be carried into effect or supported. It is however understood, that this species of judgment or arbitration shall not deprive the contending parties of the right they have to resort, on their return, to the judicial authority of their country."

In considering the effect of this treaty in the present case, I remark first, that its language does not precisely cover an action in rem like the present. Such an action is more than a mere difference between the master and the crew. It involves the question of lien upon the ship and her condemnation and sale to pay the same. In the absence of any express words, it is hard to infer that it was intended to confer upon consuls and vice consuls, the power to direct a condemnation and sale of a ship—a proceeding which brings up, for determination, many questions besides those relating to seamen. Moreover the statute of August 8, 1846 [9 Stat. 78], which was passed to render effective this provision of this treaty, confers upon the commissioners of the circuit court full power, authority and jurisdiction to carry into effect the award, arbitration or decree of the consul and for that purpose to issue remedial process, mesne and final, and to enforce obedience thereto by imprisonment. It certainly cannot be supposed that it was the intention to give to the commissioners of the circuit court power to make a decree in rem, and direct the sale of a ship. This position, that the treaty is not applicable to the present case because it is a proceeding in rem, which did not strike me with much force upon the argument, has gained strength in my mind by reflection, and I confess that I am now inclined to the opinion that it is well taken; but I do not intend to rest my determination upon it. Nor do I discuss the position that the treaty was not intended to apply to any difference, except personal differences, between the master and the seamen alone, such as assaults and the like, and does not cover differences as to wages, to which the owners as well as the ship are always real parties.

But I pass on to consider whether the effect of this treaty is to prevent the courts of admiralty of the United States from taking cognizance of any action brought by seamen to recover wages earned by them on board a Prussian vessel. At the outset, it appears strange to hear it contended that the jurisdiction of the district courts of the United States is thus to be limited, because of an agreement arrived at between Prussia and our government, as to the jurisdiction of our own courts. Courts are created and their jurisdiction fixed by the law-making power; and the extent of their jurisdiction does not appear to be a fit subject of an agreement with a foreign power. If, in any case, the powers exercised by the courts become a subject of discussion between our government and a foreign nation, and any limitation of the jurisdiction, already conferred by law, be found to be desirable. the natural, if not the only way of accomplishing such a result would be by the action of the law-making power, instead of the treaty-

making power. It appears reasonable, therefore, at least to require that an intention to accomplish such a result by a treaty, should be manifested by express words. The treaty under consideration contains no such definite provision. It simply declares that the consuls shall have the right to sit as judges and arbitrators in certain cases, without the interference of the local authorities, which is a very different thing from saying that the courts of the United States shall not have jurisdiction in such cases. Furthermore, the law-making power established the district courts of the United States and the jurisdiction thereof, and gave to them, in civil cases of admiralty and maritime jurisdiction, all the judicial power vested in the national government by the constitution; and it is not to be lightly supposed that the president, acting with the advice of the senate as the treaty-making power, has undertaken to repeal, pro tanto, an existing law relating to the jurisdiction of the courts, and to remove from the jurisdiction of the district courts certain classes of actions, and that by reason of their subject matter, for the provision in this treaty is not confined by its language to Prussian subjects, but applies to all seamen on Prussian vessels without regard to their nationality. It seems to me that no such intention should be imputed to the treaty, if any other can be discerned—and another, and a reasonable intention can be discerned when we consider, in connection with the treaty, the well known practice of maritime courts in respect to actions brought by seamen to recover wages earned on foreign vessels. Such actions, courts of admiralty have long been accustomed to entertain, or to decline, in their discretion. Ordinarily, in the exercise of a sound discretion, they have refused to entertain such actions, when the consul of the foreign power shows reasonable grounds for such declination, and his willingness to determine the matter in controversy. The Nina, W. & B. Ad. p. 180, n.

Having this practice in view it may well be inferred, from the language used in this treaty, that the object of the provision in question was to insure, so far as possible, without a repeal of the existing law, a declination of such actions by the courts in all cases where the consul has acted, and perhaps also where he expresses a willingness to act, as judge or arbitrator between the parties—thus giving to the foreign nation the guarantee of this nation for the continued exercise, by the courts, of that sound discretion which has ordinarily been exercised, and committing the nation to answer any demand which might arise from any omission by its courts to exercise such a discretion in this class of cases. Such an effect given to the treaty appears to my mind to be reasonable and sufficient to accomplish all that was intended. To hold that the treaty repeals pro tanto the act establishing the district courts, and ousts them of all jurisdiction in this class of cases, would permit consuls to refuse to act, and at the same time withhold from seamen—and American citizens, it may be—all right of resort to the courts of the land. It would give opportunity for great frauds, and open a wide door for the oppression of a class of men entitled by the maritime law, above all others, to the protection of maritime courts. Of the use which would be made of such a construction of the treaty, the present attempt, in violation of all law, to appropriate some $1,100 of the earnings of these men, is not a bad illustration.

Under the view of the treaty above indicated, I am thus brought to consider whether the evidence sustains the averment, that the consul-general of Prussia has already taken cognizance as a judge or arbitrator of the demand of these seamen, and makes out a case where, for that reason, this court should decline to entertain the action.

The words "judge and arbitrator," used in the treaty, must be taken in their ordinary significance. They imply investigation of facts upon evidence, the exercise of judgment as to the effect to be given thereto and a determination therefrom. And the use of these words indicates an intention not to deprive the seamen of a full and fair hearing of their cause and a decision thereof. If such a hearing had been given these men by the consul, the case would have been different. But here nothing has been done which can in any fair sense be called a hearing of the cause. The consul has not even gone through the form of sitting as judge or arbitrator in respect to the demands of these men. He examined no witnesses, he did not bring the parties before him, and he made no definite determination whatever. The men say that he refused to hear their story at all. The mate swears that he demanded to see the captain's charge against him and he was refused. The vice-consul denies this, and says that he did listen to the men, and because they admitted themselves deserters, there was nothing to do but to tell them they had forfeited their wages, which he did. But he cannot say what persons admitted having deserted, and on cross-examination he shows that the admission was simply an admission by some, he does not know whom, of having left the vessel without leave. He admits having urged the men to go and see the captain, and expressed confidence that if they spoke civil the master would pay them their wages, which appears to be inconsistent with the idea that he had passed on the demand and adjudged the men not entitled to any wages whatever.

The consul is not a court, and neither his record nor his testimony is conclusive on this court. He cannot shut his door in the face of parties and then, by declaring that he has adjudicated upon the demand, cut them off from a resort to the courts. Before he can call

upon the courts to decline to entertain the action, he must show that he has given or is willing to give, to the seamen that hearing which the treaty intends they should have. Here the vice-consul himself testifies, "No adjudication was made in writing—a memorandum only was made. It was noted on the protocol as follows: 'A requisition has been made and given to the captain to be given to the court.'" The making such an entry is not sitting as judge or arbitrator on the present demand. To hold, on such proof, that the vice-consul has acted as judge or as arbitrator in respect to this demand, would countenance a mode of procedure which I should be sorry to see obtain. My conclusion, therefore, is that there has been no such examination and adjudication of the matter in hand by the consul as the courts require and the treaty intends to secure.

In the absence then of any legal limitation of the jurisdiction of the court by the treaty, and in the absence of any proof of such action on the part of the consul as should call upon the court to decline to entertain the action, I deem it my duty to proceed to render a decree—and I do this the more willingly because the master of this vessel is half owner of her, and is here present, where also the seamen are—and because the ship is laid up here by reason of war, nor can it be told when, if ever, she will return to her home. It is a vain thing, therefore, to say to these sailors, who, although having some $1,100 of wages due, and unpaid, are left paupers, that they must go to Prussia, and there await the return of the ship in order to enforce their demand. If they cannot now maintain this action, they are practically deprived of all remedy, and thrown upon this community penniless. Against such a result my sense of justice revolts, and I am unwilling to believe that it is compelled by the law. I, therefore, without hesitation, pronounce in this case the decree which the maritime law, applied to the facts, requires, and condemn the vessel to pay the wages of the men.

In considering this case thus far, I have treated the action of the vice-consul as equivalent to that of the consul, and have so spoken of it. In point of fact, Dr. Roesing, the consul-general who signed the requisition, which is the only official act proved, aside from the memorandum on the protocol, never saw either the master or the men, the vice-consul acting for him in everything, except signing the requisition. I have also spoken of the consul as the consul of Prussia, and have considered him to be the official referred to in the treaty with Prussia.

The point has been taken that the proofs show Dr. Roesing to be consul-general of the North German Union; that there are now no consuls of Prussia, nor any similar treaty with the North German Union. But it appears, from the law, proved, that the consul of the North German Union is the consul of each power comprehended in the Union, which is a confederation rather than a Union. Besides, the executive department recognizes Dr. Roesing as the consul of Prussia, by virtue of his appointment as consul-general of the North German Union, and the courts are bound by the action of the executive in such a matter, the question being political, and not judicial.

There remains to allude to the phase of the case which is presented by the fact that the libel is filed by Newman, the mate, to recover his own wages, and also the wages of the other men, as the assignee of their demands. So far I have treated the case as if all the men were parties libellant.

The evidence shows the execution of a formal assignment to the mate of the claims of the other men, but it also appears that the assignment was without consideration, and that the men all expect to receive whatever may be recovered as their wages. This mode of procedure to save multiplicity of suits seems to have been adopted in ignorance of the rule of the admiralty, which enables several seamen to join in one action; and the mate, upon the trial, filed a consent that the other men be now joined as co-libellants, and receive in their own persons whatever might be awarded for their claims. Upon such a consent and such facts, I deem it competent to permit all the seamen to join in the action, upon petition to be made co-libellants, and, on showing the cancellation of their assignments to the mate, to take a decree in their own names for the wages found due them. Two of them are minors, it is true, but, in the admiralty, minors who are mariners are permitted to sue for their wages in their own names. All seamen are in a certain sense treated as minors in maritime courts.

In accordance with these views, let a decree be entered in favor of the mate, for his wages earned in the services of this vessel, and still unpaid, with a reference to ascertain the amount, and let similar decrees be made in favor of the seamen, upon the filing of their petition, and showing the cancellation of their assignments to the mate.