## Case No. 8,346.

### The LILIAN M. VIGUS.

[10 Ben. 385.] [1]

District Court, S. D. New York. April, 1879.

SEAMEN'S WAGES—JURISDICTION — BRITISH STATUTE—DESERTION—OFFICIAL LOG.

1. Seamen filed a libel against a British vessel to recover wages. The owners of the vessel objected to the court's entertaining jurisdiction of the cause, and the British consul also protested against it. Held, that, while under such circumstances, the court would refuse to entertain jurisdiction unless there were special circumstances in the case, yet in this case, as none of the seamen belonged in Nova Scotia, where the vessel belonged, and when the libel was filed it was uncertain for what port the vessel would sail, and when the cause was heard the vessel had finished her voyage and it was uncertain where she was, a refusal to entertain the cause would be practically a denial of justice and the same would be entertained.

2. The 190th section of the British merchant's shipping act [of 1854] did not preclude the sailors from maintaining the action.

[Cited in The Sirius, 47 Fed. 827, 828.]

3. The libel of the seamen alleged a wrongful discharge from the vessel, in the port of New York, and the answer set up as a defence that the men had deserted. On the trial, the libellants were allowed to amend their libel so as to allege a refusal by the master of the vessel to furnish proper food and other ill treatment by him, by reason of which their contract was broken. It appeared on the trial that the men had complained of being compelled to work more hours in port than they thought was right, and that whatever refusal of food there had been, had been in consequence of their refusal to work. The men complained to the consul, who

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

heard their case and decided that they must go back to the ship and go to work, whereupon they went back to the ship, got their clothes and left her. Entry of their having left had been made in the official log by a person not attached to the ship, but under the captain's direction. The entry was not made on that day, and the date when the entry was made was not stated in the entry. Held, that the lack of the date when the entry was made was fatal to the value of the entry as a proof of desertion of the men under sections 244, 250, and 281 of the act above mentioned.

4. The certificate of the British consul that he had examined the entry and that the desertion was properly entered would be disregarded, inasmuch as it was not made to appear that the fact of the entry's not having been made on the day of the occurrence was made known to him.

[Cited in The Topsy, 44 Fed. 636.]

5. The circumstances of the case, as shown in the evidence, did not show a justification of the seamen in leaving the ship, but their so doing was so far mitigated by evidence of apparent connivance on the part of the second mate in efforts by boarding-house keepers to induce them to desert, that the court would not hold that their wages were forfeited, and the libellants might recover the amount of wages due.

In admiralty.

Andrews & Smith (W. R. Beebe, advocate), for libelants.

Hill, Wing & Shoudy (L. S. Gove, advocate), for claimants.

CHOATE, District Judge. This is a libel for seamen's wages. The vessel is a British vessel belonging to Halifax, Nova Scotia. In February, 1877, she sailed on a voyage from Liverpool to Havana, thence to another port in the West Indies and thence to New York and thence to a port of discharge in Great Britain or Ireland, the voyage not to exceed eighteen (18) months. The bark arrived at New York upon this voyage on the 6th of July, 1877. The crew were regularly shipped for the voyage under written articles. The libellants, eight of the crew, left the vessel on the 10th of July, while she was at New York. In their libel, which was filed on the 21st of July, 1877, they alleged that they were discharged on the 10th of July. The vessel having been attached, the claimants appeared and answered, denying the discharge and averring that the libellants, without notice or reason, deserted the ship; that an entry thereof was duly made in the official log, and that by the British Merchant's Shipping act and by the terms of the articles they thereby forfeited their wages. Upon the trial the libellants were permitted to amend their libel by alleging "that at the port of New York the master refused to give them good and proper food; that he furnished to libellants rotten and maggotty food; that he furnished no fresh meat or vegetables; that for several days he deprived them of any food; that he did not permit food to be cooked for them for several days; that they were compelled to go on shore and purchase food for their necessary sustenance; that they were compelled unnecessarily to work at unreasonable hours without food or

proper rest, which was a breach on the part of the master of his proper duty and in violation of his contract with them, by means whereof the same was terminated."

It is insisted on the part of the claimants, that this court ought not to entertain jurisdiction of the cause, but should leave these libellants to seek their remedy, if they have any, in the courts of Great Britain, to which country the vessel belonged. The British consul at this port also protests against this court taking jurisdiction. But while it is doubtless true that the court will in such a case refuse to entertain the jurisdiction unless special circumstances require that protest to be disregarded (The Becherdass Ambaidass [Case No. 1,203], yet I think in the present case a refusal to hear and determine the cause would virtually amount to a denial of justice. The domicile of the parties is an important fact in determining this question. Patch v. Marshall [Id. 10,793]. Of the eight libellants it does not appear that any belong in Nova Scotia, and several of them are from different European countries. The bark, though bound to some port in Great Britain or Ireland, has long since finished her voyage, and it is uncertain now where she is, and at the time the libel was filed, it was wholly uncertain for what port she would sail. To send these sailors, therefore, to Halifax for the prosecution of these claims at this late day would be practically equivalent to denying their claim altogether, since there appears to be no probability that they would find there either vessel or owners to sue. Whether or not the court will take jurisdiction of a controversy between foreign seamen and the master of the vessel or her owners, is a question to be determined upon the circumstances of each particular case. Bucker v. Klorkgeter [Id. 2,083]; The Napoleon [Id. 10,015]. Nor does the 190th section of the English act preclude the seamen from maintaining this suit, if it appears to the court that justice requires that it should entertain the jurisdiction. By that section it is provided as follows: "No seaman who is engaged for a voyage or engagement which is to terminate in the United Kingdom, shall be entitled to sue in any court abroad for wages, unless he is discharged with such sanction as herein required, and with the written consent of the master, or proves such ill usage on the part of the master or by his authority as to warrant reasonable apprehension of danger to the life of such seaman if he were to remain on board." It is urged on the part of the claimants that this constitutes a part of the contract. It is not, however, embodied in the shipping articles, either directly or by reference thereto, as a part of the agreement between the seamen and the vessel. Even if it had been, this court might still entertain the suit. The rule is thus stated by Judge Betts in the case of Bucker v. Klorkgeter [supra]: "While in general, our courts will respect and enforce a stipulation between the foreign master and the crew, which limits them to suing in their own country, they have frequently asserted both their power and their willingness to grant relief, whenever the interests of justice demand that they should do so." While the English courts have given effect to such stipulations in the articles, and on that ground refused relief, they have not recognized such a prohibition of the foreign law as in itself precluding them from entertaining suits by seamen. Johnson v. Machielsne, 3 Camp. 46; Gienar v. Meyer, 2 H. Bl. 603; The Nina, L. R. 2 Adm. & Ecc. 44.

In view of the fact, therefore, that the connection of these seamen with the ship has been actually severed, and that the destination of the vessel was wholly uncertain, and that they have no certainty of relief, if remitted to the foreign jurisdiction, and have not their domicile there, I think it clear that this court should determine this controversy, which is, in substance, whether the circumstances under which the libellants left the vessel were such that they have thereby forfeited the wages earned by them up to the time of their arrival here.

There is no evidence whatever to sustain the allegation of the original libel that the seamen were actually discharged in New York. After some disagreement with the captain, they summoned him before the British consul, and all hands appeared at the consul's office, before the 2d vice-consul, on the forenoon of the 10th of July, and the 2d vice-consul, after hearing the complaint of the men, and the statement of the master, directed the seamen to return to the ship. The same day, between one and two o'clock, they came back to the ship, with a wagon, went into the forecastle, packed up their clothes, and left the ship, taking all their traps with them, and never returned. They asked leave of no one to go. They were bound, by the articles, to remain by the ship, till her return to the final port of discharge in the United Kingdom, and there can be no question, independently of the question whether the statute requirements to prove desertion have been complied with, that they deserted the ship, unless their leaving was justified or excused by the circumstances of the case. The defence set up is a desertion, and a forfeiture of wages by reason thereof, under the provisions of the British merchant's shipping act. The statute requires that upon the commission of the offence, "an entry thereof shall be made in the official log book, and shall be signed by the master, and also by the mate or one of the crew," and if the offender is still in the ship, he is to be furnished with a copy of the entry, or it is to be read over to him, and his reply is to be also entered in the log. This last requirement obviously does not apply to the case of desertion, where the seaman does not return to the ship (section 244). By the same act (section 281), it is provided that: "Every entry in every official log shall be made as

soon as possible after the occurrence to which it relates, and if not made on the same day as the occurrence to which it relates, shall be made and dated so as to show the date of the occurrence, and of the entry respecting it, and in no case shall an entry therein in respect to any occurrence happening previously to the arrival of the ship at her final port of discharge, be made more than twenty-four hours after such arrival." In this case, the master kept no official log on the voyage prior to the ship's arrival in New York. He made memoranda on pieces of paper of matters taking place on the voyage, which, by law, he was required to enter in the official log. The mate was wholly incompetent to keep this log, and immediately on the arrival of the ship in New York, the mate left the ship and did not return. On the morning after his arrival, the master engaged one Ferris, a shipping-broker, to do some business for him, and among other things, to write up the official log. Some entries were thus made, dated in the preceding February, from the captain's memoranda, which it is unnecessary to refer to further. In accordance with this request, Ferris wrote in the official log entries dated July 6th, 7th, 8th, 9th and 10th. These entries were all written either from memoranda in writing furnished by the master, or at the dictation of the master or the second mate, and, after being written, they were carefully read over to the master, mate and steward, by whom they were signed. The second mate could not write, and he signed by mark. It is objected by the libellants, that this is not to be considered as an official log such as the statute requires, that it cannot be thus made up by a stranger; but I see no legal objection to the master or the mate thus using an amanuensis, provided that the person so employed acts simply as such, and that the proper officers and others of the ship's company duly make the entry their own by signing it, and provided they fully understand and intend that which they thus adopt and make their own. Nor does it seem to be a valid objection to these entries that prior to the arrival in New York no official log was kept. The entries for these days in port constitute none the less on that account, if they conform to the act in all respects, an official log for the days to which those entries relate. It seems, however, to be an absolute requirement of the act that if the entries for a particular day are not made on that day, the entry itself shall show the date on which it is made. (Section 281 cited above.) Ferris testifies that the entry for the 6th of July, which was Friday, was made on Saturday; that for the 7th and that for the 8th were made on Monday, the 9th; that generally, the entries were made on the day following the day they bear date. He does not speak positively as to those of the 10th, but upon his whole testimony they must be taken to have been made on the 11th. Yet in no one of these entries is the date on which the

entry was made given. A strict compliance with the statute is required as a condition precedent to the enforcement of any forfeiture of wages under the statute. Macl. Shipp. (2d Ed.) p. 233; The Two Sisters, 2 W. Rob. Adm. 144. Although I do not find any case in which this particular defect has been made the ground of excluding the log as evidence of the alleged desertion, in any decided case in England, I have no hesitation in holding that the entry is on this ground fatally bad. Under a statute of the United States, which was somewhat different in its terms, but which had a similar purpose; it was required that the entry be made upon the very day that the offence had been committed. A strict compliance with the statute in that respect has been held to be absolutely essential to the forfeiture of wages under it. Cloutman v. Tunison [Case No. 2,907]; The Rovena [Id. 12,090]; Knagg v. Goldsmith [Id. 7,872]. And see The Catawanteak [Id. 2,510]. These statutes have received a strict construction because they are highly penal in their character. I cannot distinguish between this requirement that the date of the entry should appear in the entry itself, if it be not made on the day of the alleged offence, and any other requirement of the statute regulating the nature and mode of the entry to be made. It is not merely directory and a non-essential part of the evidence of desertion prescribed. Parliament having expressly required it to be so made, the method thus directed must be regarded as equally essential with the other parts of the act respecting the entry in the log. A certificate of the British vice-consul on the shipping articles, that he has inquired into the matter and found that the allegation of the desertion is true and that a proper entry of such desertion in the official log has been produced to him, has been produced by the claimants. The opinion of the representative of the British government upon such a question of the construction of an English statute would, in the absence of any authoritative decision of an English court, receive the most respectful attention of this court; but in this case the irregularity in the entry in the log is not disclosed by the entry itself. It is shown by testimony dehors the instrument. And there is no evidence nor any reason to believe that the fact thus testified to was brought to the attention of the vice-consul. His certificate, therefore, only shows that in his opinion the entry in the log is, on its face, a proper entry. This is doubtless correct, and in the absence of any evidence to show when an official entry is made the presumption is that it was made the day it bears date. Douglas v. Eyre [Id. 4,032]. The defence therefore set up in the answer, that the libellants have forfeited their wages under the provisions of the merchant's shipping act is not made out. Nor does the answer set up any defence by way of diminution or subtraction of wages on the ground of misconduct or breach of contract, working dam-

age to the ship or her owners, which may, it seems, be shown by other evidence though not sustained by a proper entry in the log. Abb. Shipp. (11th Eng. Ed.) p. 153; The Cadmus [Case No. 2,280]; Knagg v. Goldsmith [supra].

I see no legal ground, therefore, on which the libellants can be refused a decree for their wages. Though the act proved would, if properly entered in the log, amount to desertion, and would lead to a forfeiture of wages already earned, in whole or in part, according to the terms of the merchant's shipping act, yet if no such proper entry is made, the forfeiture that would otherwise be incurred is deemed waived or released. By the 250th section of the same act it is provided: "Whenever a question arises whether the wages of any seaman are forfeited for desertion, it shall be sufficient for the party insisting on the forfeiture to show that such seaman was duly engaged in or that he belonged to the ship from which he is alleged to have deserted, and that he quitted such ship before the completion of the voyage or engagement, or, if such voyage was to terminate in the United Kingdom and the ship has not returned, that he is absent from her and that an entry of the desertion has been duly made in the official log book, and thereupon the desertion shall, so far as relates to any forfeiture of wages or emoluments under the provisions hereinbefore contained, be deemed to be proved, unless the seaman can produce a proper certificate of discharge or can otherwise show to the satisfaction of the court that he had sufficient reasons for leaving his ship." This provision of the statute, in connection with its other parts, appears to be understood as abrogating the general rule of the maritime law which punishes desertion by forfeiture of wages, in all cases where the statute is applicable, so that the proper entry in the official log is, in such a case, an essential part of the proof required to make out the defence of desertion from a British ship. The Two Sisters, 2 W. Rob. Adm. 137; Macl. Shipp. (2d Ed.) p. 234. From these authorities it seems to follow that the payment of wages cannot be resisted on the ground of desertion and consequent forfeiture where no such entry has been made in the official log, even though when the suit is brought the voyage is not completed or the ship has not returned, and though the evidence would sustain the charge by the general maritime law. It, perhaps, is unnecessary therefore, to examine further into the alleged excuses of the libellants for leaving the ship. But as the case has been fully tried and argued upon the merits as well as upon the technical ground of the compliance with the terms of the statute on the part of the ship, I will briefly state the result of my examination of the evidence. The seamen complain that they were served, while in port, with biscuit having maggots

in them, and five of them have so testified. This charge is, in my judgment, completely disproved by the testimony of the steward and one of the seamen, the captain and second mate, and by an entirely disinterested witness, a baker, who examined the bread, and the proof is, I think, entirely satisfactory that the bread shown to him was a fair sample of that served to the crew. The provisions furnished to the crew while in port were such as the articles required, and I find nothing in the articles or elsewhere to require the master to furnish any thing not stipulated by the articles, because he happens to be in port, where fresh meat and vegetables may easily be obtained. The charge that the master deprived them of food for several days has this foundation: The bark arrived on Friday evening. On Saturday the master was on shore most of the time, leaving the ship in charge of the second mate. The men were called up at half-past four or five o'clock in the morning and they complained to the second mate that they should not be required to work in port longer than from six to six. In consequence of the trouble between this officer and the men on Saturday morning, the master called them all aft that afternoon and told them that there was nothing in the articles limiting their work between the hours of six to six, and that they must work whenever required, and must obey the second mate, and he told them that if they refused to work their grub would be stopped, and he directed the mate to give them nothing to eat so long as they refused to work; that when they were willing to go to work again they should have their meals. Afterwards, and on the same day, the master not being on board, the men refused to do duty which the second mate required of them, insisting that it was after six and that they could not be required to do such work, knocking rust out of the bob-stays, after working all day, and that they were entitled to rest, as it was Saturday night. The mate kept them at work at other ship's duty and gave them no supper. They, or some of them, then left the ship without leave, and remained away till late at night. On Sunday and Monday they all had breakfast. Most of them left the ship without leave on Sunday after breakfast and were gone all day. Those who remained and did duty, had their dinner and supper on board. On Monday they were turned to very early, and after breakfast several of them left without leave. About two o'clock they returned, and offered to go back to work, but the second mate refused to let them turn to, and told them that they could do no more work on the ship that day. In this he clearly went beyond the instructions of the master, and in connection with what had already taken place, it was a plain intimation to them that they could get no more meals on the ship that day. Aside from this instance, which affects three or

four of the men, it is not proved that there was any refusal of the master or mate to give them their meals, while they were on board, except while they were actually insubordinate. No authority is shown either justifying or condemning this mode of punishment or coercion by depriving seamen of their meals. It is obvious that it cannot safely or properly be carried very far, but as actually applied or threatened in this case, I do not think it constituted any such harsh or cruel treatment, or breach of contract on the part of the ship, as released the seamen from their contract. The refusal to let them come back to work on Monday, was after a prolonged absence without leave, and was understood by both mate and seamen to extend to that day only, for they all came back at night and had their breakfast Tuesday morning, and went to work. It was not a case where the seamen were deprived of food and were without reason to expect they could get any. The Castilia, 1 Hagg. Adm. 59. On Monday they got a summons for the master to appear before the consul the next day, and on Tuesday, the master and the men went to the consul's office, as above stated. The direction of the consul was proper, and in my judgment nothing had been done by the master in the way of harsh or cruel treatment, which, as matter of law, justified the men in refusing to go back to their duty. They had no reason to apprehend any deprivation of food if they returned to the ship and to their duty. Instead of doing so, they went to the ship later in the day with a wagon, took away their clothes, and finally left the vessel. While, however, the case does not show circumstances which, in law, amount to a justification of the seamen in leaving the ship, it does show circumstances which so far mitigate their offence, that even if a technical desertion were made out, it would, in my judgment, call for the forfeiture of very little of their wages already earned. The forfeiture under the English statute may be of the whole or any part of the wages already earned. It appears in this case, that from the time the ship arrived, the second mate, who was left in command of her, suffered a seaman's boarding-house keeper to remain on board, and to consort with the seamen and to stimulate them to insubordination, to induce them from time to time to leave the vessel. Although by his own testimony, he overheard this person on Monday, when the men refused to do duty, tell the seamen: "Never mind, boys, I'll get you your wages," yet, he still tolerated him on the ship, and allowed him to stir up the men to disobedience, and to tempt them to leave the ship, and apparently made no effort to counteract his influence with the men. It was clearly the duty of this officer to have expelled this person, and to have cautioned the seamen against him. Both the English and American statutes make it a misdemeanor for such a person to solicit the sailors on the ship during the twenty-four hours after her arrival. This necessity for legislation to protect the seamen from this class of persons, shows how dangerous to the discipline of the ship their presence is. And it is, I think, the proper conclusion from the testimony in this case, that the second mate was either a consenting party to the seamen being enticed away, or that he was, at the least, grossly negligent of his duty in protecting them from this interference. Three days' persistent effort of one of these persons, having a strong interest to foment trouble between them and the ship, resulted in their being enticed away and misled as to their rights. He put them in communication with lawyers on shore and it may well be presumed that the advice they got was such as would further his own purpose to induce them to leave the ship. All this the mate should and probably did foresee. I have given no credit to the testimony of the two boarding-house masters, called as witnesses by the seamen. Their statement that the master took them into his confidence and told them that he wanted to get rid of the crew, is incredible in itself, and not sustained by any other evidence; and the general appearance of these witnesses and their contradiction on many points compel me to withhold all credit from them. But I found the foregoing conclusion on the testimony of the second mate and the master. There was about five hundred dollars due to these seamen when they arrived in New York. They should not have been knowingly permitted to be enticed away so as to forfeit their wages, either through the direct acts of the master or mate, or their negligent omissions of duty. Such circumstances have been held to excuse or mitigate the offence of desertion, even where an entire justification could not be made out. And in addition to the circumstances above stated, the method of discipline adopted by the second mate, with the concurrence of the captain, was such as to aid the efforts of the boarding-house master. This discipline was work at extraordinary hours while in port, no change from the diet served at sea, deprivation of meals for refusal to work. These modes of discipline, though not illegal, could not well have been improved if intended to assist those who were well known to be endeavoring to induce the sailors to leave. I think the language of Judge Hopkins, in Magee v. Moss [Case No. 8,944], applicable to this case: "The forfeiture of wages earned by a hard and perilous service is a severe penalty and should be exacted only on a clear legal cause. So it has been considered by the courts, and those who claim this penalty have always been required to show themselves to be clearly entitled to it by the performance on their part of all the requisitions of the law. The master of the vessel must throw the fault on the offending seamen. He

must deal with them fairly and honestly and in good faith. He should neither endeavor to drive them from their duty, nor deceive and entrap these rash and ignorant men into a course of conduct which he sees may draw upon them the loss of their wages while they have no such suspicion. If they are really and truly acting under a mistaken opinion of their rights and not from a dishonest or rebellious disposition, they should be undeceived, their error should be explained, or at least they should not be drawn, or permitted, by an insidious silence or inattention to their proceedings, to involve themselves in the crime of desertion with its ruinous consequences. A practice of this sort upon sailors may well be considered as a fraud, and the contriver ought not to gain by it." While it is important to adhere to the rule forfeiting wages for wilful desertion, regularly proved, for the sake of maintaining the proper discipline of the ship (The Cadmus [Id. 2,282],) it is equally the duty of the courts to secure to the seamen fair and just treatment and to protect them against practices such as they were exposed to in this case and which are often the means adopted to deprive them of their fairly earned wages. There is, I think, no serious injustice done to the owners of this vessel, therefore, although the failure to prove the desertion is owing to what may seem to be a technical defect in the official log. Decree for the libellants with costs, and a reference to compute amount due.