## THE SIRIUS.

### PAPPING *et al.* v. THE SIRIUS.

*(District Court, N. D. California.* October 5, 1891.)

1. SEAMEN—WAGES—BREACH OF CONTRACT BY MASTER—EXCESSIVE LOADING—DESERTING VESSEL IN FOREIGN PORT.

The English merchant shipping act, 1876, in section 25, requires British ships, with certain exceptions, to be conspicuously marked with longitudinal lines, showing the position of each deck above the water line. Section 26, subd. 3, requires the owner entering his ship outward from any port of the united kingdom to insert in the form of entry delivered to the collector the distance in feet and inches of each of these lines from the plimsol mark; and subdivision 4 authorizes the collector to refuse to enter the ship outwards unless this regulation is complied with. By subdivisions 5 and 6 the same statement must be inserted in the shipping articles before they are signed by any member of the crew, and also in the official log-book. Subdivision 7 provides that a ship thus marked shall be kept so marked until her next return to a port of discharge in the united kingdom. *Held,* that the seamen of such a vessel are directly interested in maintaining the load-line as indicated by the plimsol mark, and that to load her a foot and a half deeper, against their protest, constitutes such a breach of their agreement as will justify them in leaving the ship in a foreign port.

2. SAME—LIBEL FOR WAGES—JURISDICTION OF FOREIGN COURT.

Where seamen, upon the advice of the British consul, thus left a vessel in the port of San Francisco, and it appeared that she was loaded with a cargo for Chili, which was then in a state of insurrection, that her movements were uncertain, and her probable return to England remote, and that she was under bottomry, and liable to be sold, the United States district court will take jurisdiction of a libel for wages, especially when so requested by the British consul, notwithstanding that the wages were payable only in England, and that the English merchant shipping act, 1854, § 190, provides that no seaman engaged for a voyage which is to terminate in the united kingdom shall be entitled to sue for wages in any foreign court, unless discharged with the sanctions therein prescribed, and with the master's written consent, or proves such ill usage as to warrant a reasonable apprehension of danger to his life if he remain on board.

3. SAME—WAGES—DAMAGES.

It appearing that all the seamen found employment on other vessels, no allowance will be made for their passage home, but they will be awarded wages to the time they left the vessel, with $10 each as general damages for breach of the contract.

In Admiralty. Libel for seamen's wages and their transportation home.

*Andros & Frank*, for libelants.

*E. W. McGraw*, for claimant.

Ross, J. The libel in this case is for wages of the seamen and their transportation home. Objection is first made by the claimant to the court taking jurisdiction of the cause, and, next, it is urged that the libelants deserted the ship before the expiration of their contract of service, and thereby forfeited all claim to wages, and, of course, to transportation. The case is this: The libelants shipped in England in November, 1890, under shipping articles providing for a voyage from "Cardiff to Teneriffe, or any ports or places within the limits of 75 degrees north, and 60 degrees south, latitude, the maximum time to be three years, trading in any rotation, and ending in the united kingdom." At that time the British law in relation to the plimsol mark was as follows:

"Section 25, Merchant Shipping Act, 1876. Every British ship (except ships under 80 tons register, employed solely in the coasting-trade, ships employed solely in fishing, and pleasure yachts) shall be permanently and conspicuously marked with lines of not less than twelve inches in length and one inch in breadth, painted longitudinally on each side amid-ships, or as near thereto as practicable, and indicating the position of each deck which is above water. The upper edge of each of these lines shall be level with the upper side of the deck plank next the water-way at the place of marking. The lines shall be white or yellow on a dark ground, or black on a light ground.

"Sec. 26. With respect to the marking of a load-line on British ships, the following provisions shall have effect: (1) The owner of every British ship (except ships under 80 tons register, employed solely in the coasting trade, ships employed solely in fishing, and pleasure yachts) shall, before entering his ship outwards from any port in the united kingdom for any voyage for which he is required so to enter her, or, if that is not practicable, as soon thereafter as may be, mark upon each of her sides amid-ships, or as near thereto as is practicable, in white or yellow on a dark ground, or in black on a light ground, a circular disk 12 inches in diameter, with a horizontal line 18 inches in length drawn through its center. (2) The center of this disk shall indicate the maximum load-line in salt-water to which the owner intends to load the ship for that voyage. (3) He shall also, upon so entering her, insert in the form of entry delivered to the collector, or other principal officer of customs, a statement in writing of the distance in feet and inches between the center of this disk and the upper edge of each of the lines indicating the position of the ship's decks which is above that center. (4) If default is made in delivering this statement in the case of any ship, any officer of customs may refuse to enter the ship outwards. (5) The master of the ship shall enter a copy of this statement in the agreement with the crew before it is signed by any member of the crew, and no superintendent of any mercantile marine office shall proceed with the engagement of the crew until this entry is made. (6) The master of the ship shall also enter a copy of this statement in the official log-book. (7) When a ship has been marked as by this section required, she shall be kept so marked until her next return to a port of discharge in the united kingdom."

Under this law the load-line was established and approved by the board of trade on the ship Sirius, then known as the "Scandinavia." The ship sailed for Santa Rosalia, in Mexico, thence to San Diego, and afterwards to San Francisco, at which port she secured a charter to take supplies to Chili; the owner then loading the ship one and a half feet deeper than the plimsol mark established at the time the libelants

shipped. They thereupon protested, and went ashore, and laid the matter before the British consul at the port of San Francisco, who advised them that the act was a violation of the owner's agreement with them, and that they were entitled to their discharge. Acting upon this advice of the consul, libelants demanded their discharge, which was refused. The owner offered to increase the wages of the men, but they replied that they wanted their discharge first, and would then talk about reshipping. The negotiations continued for several days, the men meanwhile doing their duty on board of the ship, but refusing to go to sea in her; the matter finally culminating in the crew leaving the ship in a body on the 1st day of May, claiming a right to their discharge. The owner refused to pay them their wages for the time they had served, or to provide them with passage home. The British consul thereupon requested this court to entertain a suit on behalf of the crew, to establish their claim, and the present libel was filed.

That the court may, in its discretion, take jurisdiction of the case is not disputed, but it is urged on the part of the claimant that in the present instance such discretion ought not to be exercised in favor of the jurisdiction. "In the absence of treaty stipulations," said the supreme court in the case of The Belgenland, 114 U. S. 355, 5 Sup. Ct. Rep. 860, "the case of foreign seamen is undoubtedly a special one, when they sue for wages under a contract which is generally strict in its character, and framed according to the laws of the country to which the ship belongs; framed, also, with a view to secure, in accordance with those laws, the rights and interests of the ship-owners as well as those of master and crew, as well when the ship is abroad as when she is at home. * * * On general principles of comity, admiralty courts of other countries will not interfere between the parties in such cases unless there is special reason for doing so, and will require the foreign consul to be notified, and, though not absolutely bound by, will always pay due respect to, his wishes as to taking jurisdiction." In the present case the British consul has in writing requested the court to adjudicate the cause. It is urged, however, on behalf of the ship-owner, that the request of the consul is not as convincing evidence of the wishes of his government as an act of its parliament; that, by section 190 of the merchant shipping act of Great Britain of 1854, actions of this kind are forbidden to be brought in a foreign country, and therefore that, notwithstanding the request of the consul, the court is not justified in taking jurisdiction of the cause on the ground that it is requested to do so by the government to which the ship and seamen owe allegiance. The section cited is as follows:

"No seaman who is engaged for a voyage or engagement which is to terminate in the united kingdom shall be entitled to sue in any court abroad for wages, unless he is discharged with such sanction as herein required, and with the written consent of the master, or proves such ill usage on the part of the master, or by his authority, as to warrant reasonable apprehension of danger to the life of such seaman if he were to remain on board."

It was held in the case of The Lilian M. Vigus, 10 Ben. 385, that the foregoing section of the English act does not preclude seamen from main-

taining a suit like the present, if it appears to the court that justice requires that it should entertain jurisdiction; and that, too, in a case where not only the ship-owner, but the foreign consul as well, protested against its exercise. In that case the court pointed out that the English courts have never recognized such a prohibition of a foreign law as in itself precluding them from entertaining suits by seamen; and MacLachlan, in his work on Merchant Shipping, page 235, in referring to the provisions of section 190 of the act of 1854, gives it as his opinion that foreign courts are not likely to give effect to them. The case at bar is much stronger for the libelants on this point than was that of *The Lilian M. Vigus;* for here, not only does the foreign consul not protest against the exercise of jurisdiction, but expressly requests the court to adjudicate the cause. To refuse to do so, under the circumstances disclosed by the evidence in this case, would be to turn the libelants away without any practicable remedy for what they claim to be a grievous wrong. They left the ship upon the advice of their consul that there had been such a breach of the contract as entitled them to their discharge, and after a refusal of the owner to discharge them. The ship was at the time loaded with a cargo for Chili, which country was then in a state of insurrection. Her future movements were uncertain, her probable return to England remote. Besides, she is under bottomry, and liable to be sold. Should she return to her own country by the end of the three years, who can tell whether the libelants, who are sea-faring men, would meet her there? Or, if one or more of them should chance to do so, how difficult it would be for them to procure evidence of the alleged breach of the contract on the part of the owner. Under these circumstances, it seems to me to be the duty of the court to entertain and adjudicate the dispute between the parties.

It is urged for the claimant that by the terms of the shipping articles the wages of the libelants are to be paid in England. That is true, and they are payable there only, if the contract has not been broken. But it cannot be seriously contended that in the event the seamen should be discharged by the owner without cause in a foreign country, or so ill treated as to justify them in leaving the ship, or in the event of any other breach of the contract on the part of the owner, entitling the seamen to treat it as at an end, the wages of the latter would not be immediately payable. The question the court in this case is asked to decide is whether there was such a breach of the contract on the part of the owner of the ship as justified the seamen in treating it as at an end. The act which it is claimed had this effect was the conceded loading of the ship below the plimsol mark established at the time of the execution of the shipping articles, pursuant to the provisions of the merchant shipping act of 1876. It is contended on behalf of the owner that the load-line so established did not enter into or become a part of the contract with the seamen; that it was "a mere police regulation," for the violation of which the sole penalty is declared to be a fine not exceeding £100. Such a penalty is prescribed by section 28 of the act of 1876, but it is prescribed as a punishment for the statutory offense therein defined, and

is a question between the offender and the government, in which the seamen are no more concerned than any other subjects. But other provisions of the act show that they are directly concerned in the establishment of the load-line, and that the parties contract with direct reference to it. By the second subdivision of section 26 of the act of 1876 it is declared that the center of the disk that the owner is, by the act, required to mark upon his ship "shall indicate the maximum load-line in salt water to which the owner intends to load the ship for that voyage;" and, by the third subdivision of the same section, the owner is required, upon entering his ship, to "insert in the form of entry delivered to the collector or other principal officer of customs a statement in writing of the distance in feet and inches between the center of this disk and the upper edge of each of the lines indicating the positions of the ship's decks which is above that center." By subdivision 4 it is provided that, "if default is made in delivering this statement in the case of any ship, any officer of customs may refuse to enter the ship outwards." By subdivision 5 the master of the ship is required to "enter a copy of the statement in the agreement with the crew before it is signed by any member of the crew;" and it is further provided that "no superintendent of any mercantile marine office shall proceed with the engagement of the crew until this entry is made." By subdivision 6 of the same section the master of the ship is also required to "enter a copy of this statement in the official log-book;" and by subdivision 7 it is declared that, "when a ship has been marked as by this section required, she shall be kept so marked until her next return to a port of discharge in the united kingdom." In view of these plain provisions of the statute, I do not see how any court can be expected to hold that the line the owner is required to mark upon his ship, to indicate the maximum load-line in salt water to which he intends to load the ship for the particular voyage, and the statement in writing of the distance in feet and inches between the center of the disk and the upper edge of each of the lines indicating the position of the ship's decks above that center, a copy of which the master is expressly required to enter in the agreement with the crew before it is signed by any member of it, and which in fact was entered in the shipping articles here in question, did not enter into and become a part of the contract. In my opinion, it formed a very important part of it. To the extent indicated by the load-line, the ship could be lawfully loaded, but beyond that, not. Of course, no merely technical violation of the shipping articles, not affecting the substantial rights of the seamen, will justify them in leaving the ship; but such is not this case. It may be they would not have been willing to assume the additional risk incident to the loading of the ship beyond the line indicated upon her; but, whether they would or not, it is quite clear that they did not. In my opinion, the submersion of the ship beyond the load-line established under and in pursuance of the provisions of the act of 1876, and with reference to which the libelants contracted, was a violation of the contract in a material particular, and entitled them to their discharge. I an unable to see how the merchant shipping act of 1890, amending, in certain re-

spects, the act of 1876, can affect this case; for the act of 1890 did not go into effect until after the making of the contract and the commencement of the voyage in question here.

I think the libelants are entitled to their wages, in accordance with the terms of the shipping articles, to May 1st, less such advances as may be shown to have been made to them; and I should also award them the cost of their passage home but for the fact that they all seem from the evidence to have, shortly after leaving the Sirius, found employment aboard other vessels, several of them having shipped for England. Indeed, the British consul testified that there is no trouble for seamen to ship from the port of San Francisco to England, there being all the time a demand for seamen for such voyages, excepting only engineers. But in this case it appears that the engineers also shipped. Under such circumstances, I think no allowance should be made for the passage home of the libelants, but each will be allowed $10, as general damages for the breach of the contract, which sum will probably cover the cost of their subsistence from the time of the termination of the contract until they secured other employment.

An order of reference to the commissioner will be entered, directing him to take testimony, and ascertain and report the amounts due the respective libelants under the views above expressed, for which, with costs, a decree will be entered.