BOULT and others *v.* SHIP NAVAL RESERVE, etc.

*(District Court, D. Maryland.* January 13, 1881.)

1. CHARTER-PARTY.—The charterers agreed to pay for the vessel a lump sum. They procured, to be put on board by freighters in Liverpool, a cargo of iron ore, at a rate of freight which, on the amount of ore put on board, would have exceeded the lump sum which they were to pay. The charter stipulated that the master should give the charterers a draft for the excess of freight between the charter and the bill of lading, the draft to be drawn on the ship's consignee at the port of discharge, payable 10 days after ship's arrival. The charter also contained a stipulation that the charterers were not to be held liable for any loss of freight arising from leakage, breakage, drainage, or any other cause beyond their control. The bill of lading fixed the freight at a certain rate per ton of cargo *delivered.* On delivery of cargo at Baltimore, there was found to be a considerable loss of weight, and the freight on the actual output was less than the lump sum mentioned in the charter. It appeared that the loss of weight was not attributable to any fault of the ship or owners, and that some loss of weight on such a cargo was always to be expected.

    (1) *Held,* that as the bills of lading called for freight only on the weight delivered, and that as the freight on the actual delivery fell short of the lump sum, there was no excess payable to the charterers.

    (2) *Held,* that the stipulation that charterers were not to be liable for any loss of freight arising from causes beyond their control, was not to be so interpreted as to entitle them to demand a fictitious excess of freight which the bill of lading did not entitle the ship to collect.

2. SUIT BETWEEN FOREIGNERS. — The charter-party was executed in Liverpool, between British subjects, and the vessel was a British ship, but the vessel having been attached within the district, and it appearing that all the facts necessary to determine the case were sufficiently proved without taking testimony under a foreign commission, *held,* that justice would be promoted by the court taking jurisdiction and disposing of the case.

In Admiralty.  Charter-party.

*Robert Baldwin,* for libellants.

*Sebastian Brown,* for respondents.

Morris, D. J. The owners of the British ship Naval Reserve, 1,831 tons, on February 4, 1880, chartered her to the libellants for a voyage from Liverpool, where she then was, to Baltimore, for the lump sum of £1,212 10s.

The charter-party shows that it was contemplated that the libellants, who were ship-brokers of Liverpool, might not load the vessel themselves, but might procure a cargo to be put on board by other freighters, at a rate which would yield them a profit, and that the consignee of the vessel, in that case, was to collect the whole freight, and they were to receive through him the excess. Accordingly, the charter-party contains these stipulations: "The freight, [that is, the lump sum] to be due and payable, on true delivery of the cargo, in cash, at current rate of exchange for bankers' 60-days' sight bills on London, on date of vessel's entry at custom-house; captain to give his draft on his consignees, at the port of discharge, in charterer's favor, payable 10 days after ship's arrival, for any excess of freight as per bills of lading and this charter. Any deficiency between freight and charter to be paid here in cash, less three months' interest and cost of insurance thereon. The charterers are not to be held liable for any loss of freight arising from breakage, leakage, drainage, or any other cause beyond their control."

The charterers, who are the libellants, did procure for the ship a full cargo of 1,800 tons of iron ore, known as "purple ore," at the rate of 14s. 3d. per ton on weight delivered. If 1,800 tons had been delivered the freight thereon would have amounted to about £70 in excess of the lump sum, and it is to recover this alleged excess of £70 that this suit is instituted. It appears, however, that when the cargo was delivered in Baltimore there was a loss of weight of about 120 tons, so that, instead of an excess, the freight actually received by the ship was some £20 less than the lump sum mentioned in the charter. The ship encountered on the voyage exceedingly rough weather, and was

obliged to put back to Crookhaven to repair her rudder, and afterwards was compelled to jettison about 10 tons of the cargo, and to put back to Queenstown to get her pumps cleared, and while there discharged and reshipped a part of the cargo. She finally reached Baltimore, and discharged the cargo during the month of June. The discharging was conducted in the manner usual in the port. The ore was hoisted from the hold and dumped into a shute leading to wheelbarrows, then wheeled to cars standing at some distance and dumped into the cars. When the cars were loaded they were run on to scales and weighed by the custom-house officials. This process of discharging in this climate in the summer season necessarily affords opportunity for the drying of the ore. Purple ore is, when dry, a very fine powder, and when wet forms into lumps about the size of grains of wheat. It takes up moisture very readily, and the difference in weight between its dry and wet condition may amount to 12 per cent. It appears from the proof that there is always some loss of weight on a cargo brought from Great Britain and discharged at Baltimore. By merchants in the trade 5 per cent. is estimated to be the average loss. On 25 cargoes received by one merchant the evidence shows that there was a loss, on every cargo, varying from $\frac{1}{2}$ a per cent. to $7\frac{1}{2}$ per cent. The loss on the cargo of the Naval Reserve was 7 37-100 per cent.

The contention of the libellants is that, as by the terms of the charter-party "the charterers were not to be held liable for any loss of freight arising from breakage, leakage, drainage, or any cause beyond their control," they were to be paid the excess of freight called for by the bills of lading over the lump sum mentioned in the charter, notwithstanding no excess of freight was collected by reason of loss of weight in the ore from drainage or evaporation or other loss, and they claim that the true interpretation of the charter entitled them to have a draft in their favor, drawn by the captain, before the vessel sailed from Liverpool; the draft to be for the amount of this excess, drawn on the consignees of the vessel at the port of discharge, payable 10 days after the vessel's

arrival. It is to be observed, however, that the charter-party speaks of an excess of freight "as per bill of lading and this charter." The bill of lading states the freight to be 14s. 3d. per ton *on weight delivered,* so that whether or not there was an excess of freight, "as per bill of lading and this charter," could not be ascertained until the cargo was delivered. This being the contract for freight expressed by the bill of lading,— a contract made by the libellants themselves with the freighters,—and it being almost an absolute certainty that there would be, on a cargo of purple ore, some loss of weight, it is scarcely supposable that the owners intended that they were to pay to the charterers a fictitious excess of freight which they could have no expectation of collecting. The more obvious and reasonable meaning of the clause, "charterers not to be held liable for any loss of freight arising from breakage, leakage, drainage, or any other cause beyond their control," in the connection in which it is found in this charter, is, it seems to me, that if there was once put on board cargo sufficient, at the rate fixed by the bills of lading, to satisfy the lump sum, then the charterers were not afterwards to be held liable to the owners for any deficiency which might arise from any cause beyond their control. This interpretation, I think, fully satisfies the language of the stipulation, and is reasonable and sensible, while that contended for by the libellants seems to me strained and unreasonable. Whatever causes there were which united to produce the loss of weight in the cargo, it is clear they were not causes attributable to any fault of the ship or owners; and as the excess of freight intended by the charter must, in my judgment, be held to be an actual excess, which the ship's consignee was entitled to collect from the consignee of the cargo, it follows that there is nothing due to the libellants. The claimants have urged the court not to exercise jurisdiction in this case for the reason that the libellants and claimants are all British subjects, the ship British, and the contract one made in Liverpool. If there were any allegations that the language of the charter is to be explained by any

usage or custom of the port of Liverpool, or if the facts necessary for the consideration of the case had to be proved by testimony to be taken in that port, there might be reasons for remitting the libellants to the courts of their own country; but as the facts necessary for the determination of the question raised are not disputed, and as the meaning of the contract seems to me perfectly clear and favorable to the party objecting to the jurisdiction, I have considered that in this case justice will be promoted by my exercising the jurisdiction which undoubtedly this court has, and by now disposing of the case. Other questions, as to the form of the libel, have been raised by the claimants, but in the view I have taken of the controversy, on its merits, it is not necessary to pass upon these questions.

Libel dismissed.