BOLDEN v. JENSEN et al.

(District Court, D. Washington, N. D. October 28, 1895.)

1. FEDERAL COURTS—ADMIRALTY JURISDICTION—INJURIES TO SEAMEN ON FOR-
EIGN SHIPS.
    A United States court sitting in admiralty has full jurisdiction of a libel filed by a seaman, who is an American citizen, to recover damages for personal injuries caused by cruel treatment while engaged as a seaman on board a foreign vessel.

2. DAMAGES FOR PERSONAL INJURIES—CRUELTY TO SEAMEN.
    Four thousand five hundred dollars were awarded to a seaman for personal injuries occasioned by torture, in punishment of insolent language, whereby the circulation of blood in his hands was arrested, causing the skin and flesh to blister and decay, and so affecting the cords as to cause his fingers to remain permanently bent, thus disabling him from performing the labors of a sailor.

This was a libel by Louis Bolden against S. Jensen and J. M. McLean to recover damages for cruelty and personal injuries inflicted upon him as a seaman upon a Chilian ship. Defendants, having been taken in custody under a warrant of arrest issued pursuant to admiralty rule 2, moved the court to quash the same and discharge them, and exonerate their sureties. This motion was heretofore denied. 69 Fed. 745. The cause is now heard upon the merits.

A. R. Coleman, for libelant.
John B. Allen, for defendants.

HANFORD, District Judge. The libelant, who is a North Carolina negro, came to Port Townsend from Valparaiso, as a member of the crew of the Chilian ship Atacama. On account of injury to his wrists and hands, he is in a most deplorable condition. The actual physical condition of those members, and the uncontradicted testimony of the physicians who have examined and treated him, proves that he has been subjected to torture, by having both wrists so tightly bound by handcuffs or cords as to arrest circulation for such length of time as to produce what the doctors term "strangulation." The skin and flesh of both palms have been blistered, caus-

ing decay, and the skin of his knuckles has, by severe bruising or chafing, been destroyed. Just above each wrist joint there are deep scars, completely encircling the wrists. The cords are so affected that his fingers remain bent, and the testimony shows that some of them, at least, can never be straightened. He is probably permanently disabled from performing any labor requiring him to grasp ropes or implements, so that it will be unsafe for him to ever attempt to perform the duties of a sailor.

By whom and in what manner were these injuries inflicted? These are the principal questions which I must determine from the evidence. The libelant has testified that his injuries are the result of his being triced up in the ship, during the voyage, by the defendants. Both of the defendants and other witnesses whom they have produced have given testimony contradicting the libelant's version of his treatment, and they deny that he was triced up or that his wrists were bound in any way to cause such injury, but they have failed to offer any testimony whatever explaining how or in what manner the injuries were inflicted. I have nothing in opposition to the libelant's plain sworn statement, except the argument of the defendants' attorney, who advances the theory that the injuries were self-inflicted by the libelant. This theory is built mainly upon the lack of evidence to prove that the defendants were actuated by any spirit of malevolence against the libelant, and the evidence tending to prove that he received humane treatment at their hands after the infliction of the injuries, and the negative testimony of the defendants and the second mate and the carpenter of the ship. The uncontradicted testimony proves that, after the ship sailed from Valparaiso, the first mate was taken ill, and, in consequence, was left at the port of Iquiqui, at which place the defendant McLean and his wife came on board as passengers. On arrival at Port Townsend, McLean represented himself to the Chilian consul and others as being the agent of the owner of the vessel, and transacted business as such agent, and declared his purpose to have the libelant imprisoned until the vessel should return to Chili, and then returned in the ship, to be dealt with according to Chilian laws, for misconduct during the voyage. At different times during the early part of the voyage, the libelant disputed with the defendant Jensen, who was the nominal master of the ship, and the second mate, and he was considered by them to be insolent and dangerous. These occurrences culminated one afternoon, when the libelant was at work on the fore topmast yard; and, being sharply and roughly reproved by the second mate for dilatoriness in his work, he answered in such a way as to bring on a quarrel. After cursing each other aloft, the second mate descended to the deck, followed by the libelant; and there, after a sheath knife, which was the only weapon the libelant had possession of, had been thrown aside by him, or taken from him by McLean, the two engaged in a fight, in which the second mate was getting worsted, when Capt. Jensen came to his rescue with a be-

laying pin. While the negro had the second mate down upon the deck, and was striking him with his fist, the captain, who is a large, powerful man, seized him by the shirt collar with his left hand, and endeavored to, if he did not actually, strike him with the pin, and then, with the help of McLean, led him aft to the cabin, put him in irons, and shut him up in a small room, where he was kept in that fix until the next day.

The negro's description of the manner of his imprisonment is to the effect that, when the captain interfered in the fight, he was struck three heavy blows with the pin on the back of his neck and head; that, in the small room off the cabin, his wrists were hand-cuffed behind his back, a rope was rove through the handcuffs, or a connecting link, and three turns of it were taken around his neck, and it was then passed through the handcuffs or link, and then to a ringbolt in the ceiling or wall of the room, and made fast, so that his position was such as to compel him to keep his head drawn backward, and to stand on his toes in order to relieve his arms from the pain of being drawn up behind his back, and he was kept in that position, without relief and without water, until nearly noon of the following day, during all of which time he was in terrible pain. The vessel was at that time in the tropics, and the room in which he was shut up was close and hot. He called and begged for water to drink, but none was given to him. When he was finally relieved, his hands were swollen and stinking. The second mate, a witness for the defendants, has testified that the negro did call for water while the witness was at supper, and that he arose from the table, and gave the negro water to drink. In this he is contradicted by the carpenter, also a witness for the defendants, who states that he ate supper with the second mate, and that that officer did not go from the table to answer any call of the negro. The defendants and their witnesses testify that the negro spent the whole night howling, cursing, threatening, and striking his head and body violently against the wall of the room, and surging to free himself from the irons and rope which held him. They have introduced, as exhibits, three ankle irons, which they claim were used instead of the handcuffs. One of the three cannot be locked, and they are all so large when closed and locked that the libelant's hands and elbows can easily pass through them. It is simply impossible that the wounds upon the negro's wrists could have been produced by these irons. It is claimed that the negro was secured by placing one of the anklets upon each of his arms, connecting the two with the third iron, passing a rope through this, in front of his shoulders, and leading back in such a way as to draw the irons up so high that his arms could not be drawn out, and that the end of the rope was then secured to a bunk in the room, leaving 18 inches of slack, so that he could stand up, sit down, or lie upon the bunk. They claim that the negro was at the time so enraged and violent that it was necessary to secure him thus, to prevent injury to himself and others in the ship. They deny most positively that the rope was used to bind his wrists, or

that any irons or rope were placed upon him which could in any way prevent circulation or cause strangulation. The attorney's theory is that the negro, in his rage, managed in some way to so entangle the rope about his wrists as to cause strangulation; but the witnesses have failed to support this theory, by testifying that they found the negro at any time entangled in the meshes of the rope, and to me the theory seems to be as unreasonable as the description given by the defendants of the manner in which they secured the negro with such irons as they have produced in court. It is manifestly impossible that the negro could have been held by these irons, unless they were so suspended from his neck as to be drawn up on his arms considerably above his elbows; and in that position, of course, they could not produce wounds upon his wrists, and it would be equally impossible for him to entangle his wrists in the rope leading from the irons above his elbows.

Besides the improbability of the story which these defendants have attempted to palm off on the court as to their humane efforts to secure this one man in such a way as to prevent the infliction of injury upon himself, in which they failed of success, I find other inconsistent and manifest falsehoods in their testimony, which compel me to discredit all of their evidence. I will mention only a few instances. Capt. Jensen admits that, while the negro and the second mate were struggling together on the deck, he tried to strike the negro a hard blow with the belaying pin; and although he was within striking distance, and held the negro by the shirt collar, and is an able-bodied and powerful man, and the negro was not on guard against him, and there was nothing whatever to hinder or prevent, yet he did not strike him, but missed the object of his aim, because the two were wriggling about. He has also sworn positively that Mr. McLean was only a passenger on the ship, and denied that he had any information or knowledge that Mr. McLean acted or claimed to be an agent of the shipowner after her arrival at Port Townsend, although it is clearly established by the testimony of the Chilian consul, as well as by the admission of McLean, that the consul advanced money to McLean on account of the ship; that McLean made contracts for loading the ship, and transacted all the business usually transacted by the master of a ship in a foreign port. McLean is a man of mature years, and was for many years a shipmaster, and has had much experience with sailors; and yet he has testified that when the fight occurred, after he had taken the knife away from the negro, he became so excited and was so nearly unconscious that he cannot tell whether, at the time Capt. Jensen arrived upon the scene, he had hold of the negro or not, and is unable to give an account of his own performances in connection with the fight; and yet he assumed to testify in the most positive manner as to all of the acts and motions of Capt. Jensen from the time he came out of the cabin until the negro had been secured in the small room. He also gave as an explanation for his own excitement that, when the fight occurred, the of-

ficers were surrounded by 10 other mutinous sailors; and yet there is not another scintilla of evidence that any of the sailors, except the libelant, were mutinous, or made any demonstrations, or even sympathized with the libelant, who was the only negro among them; and, being particularly interrogated upon the cross-examination, he was unable to specify any sailor who had made any demonstration indicating a mutinous spirit. He has also denied positively that, after arrival at Port Townsend, he gave any directions in regard to the negro, or assumed any control or authority with respect to him. In this he is contradicted by Capt. Barneson, the acting Chilian consul at Port Townsend, who has testified positively that, after the negro had been taken to the hospital, McLean required him to notify the surgeon in charge that he (McLean) would hold him responsible for the safe-keeping of the negro, as he intended to have him returned to Chili for further punishment. The personal appearances of the men indicate to me that McLean is a positive character, and inclined to be aggressive; while Jensen is of a phlegmatic temperament, and a person who probably, in the presence of such a man as McLean on board of a ship in which he claimed the rights of an owner, would be of a negative and yielding disposition. There is uncontradicted testimony in the case that, on one occasion during the voyage, McLean chastised the cook for wasting potatoes. I have no doubt he was the actual commander, and that Jensen filled the place of first mate.

I reject the testimony of both defendants, and the second mate, and also that of the libelant's witness Michael Mazello, as unworthy of belief. Although the evidence on the part of the libelant is in many respects unsatisfactory, enough has been proven to convince me that the libelant was subjected to torture, and I am equally convinced that it was unnecessary for these officers to resort to extreme cruelty in dealing with a single negro. Although he may have been insolent, in their hands he was comparatively weak and helpless. At the very time when, according to their own testimony, his violence and rage was at the maximum, these two men led him the length of the ship; and, while the captain was getting the irons from the locker, the other defendant held him. The pretense that these two experienced and powerful shipmasters were afraid of this colored boy is too utterly ridiculous. Lawful punishment, within the bounds of moderation, would have suppressed any disposition on his part towards mutiny or insubordination.

Although the injury was inflicted at sea, on board a foreign ship, the case is within the jurisdiction of this court; and, even if the libelant were an alien, it would be the duty of this court, which for such cases is a court of the world, to administer justice. In doing so the court exerts its powers under the law, and without any infraction of the rule of comity, as that rule has been defined in all the adjudged cases. See The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, in which Mr. Justice Bradley reviews the authorities,

and truly states the doctrine as to jurisdiction of courts of admiralty and the rule of comity, as follows:

"For circumstances often exist which render it inexpedient for the court to take jurisdiction of controversies between foreigners in cases not arising in the country of the forum; as, where they are governed by the laws of the country to which the parties belong, and there is no difficulty in a resort to its courts, or where they have agreed to resort to no other tribunals. The cases of foreign seamen suing for wages, or because of ill treatment, are often in this category; and the consent of their consul or minister is frequently required before the court will proceed to entertain jurisdiction; not on the ground that it has not jurisdiction, but that, from motives of convenience or international comity, it will use its discretion whether to exercise jurisdiction or not; and where the voyage is ended, or the seamen have been dismissed or treated with great cruelty, it will entertain jurisdiction even against the protest of the consul. This branch of the subject will be found discussed in the following cases: The Catherina, 1 Pet. Adm. 104, Fed. Cas. No. 13,949; The Forsoket, 1 Pet. Adm. 197, Fed. Cas. No. 17,682; The St. Oloff, 2 Pet. Adm. 428, Fed. Cas. No. 17,357; The Golubchick, 1 W. Rob. Adm. 143; The Nina, L. R. 2 Adm. & Eccl. 44; on appeal, L. R. 2 P. C. 38; The Leon XIII., 8 Prob. Div. 121; The Havana, 1 Spr. 402, Fed. Cas. No. 6,226; The Becherdass Ambaidass, 1 Low. 569, Fed. Cas. No. 1,203; The Pawashick, 2 Low. 142, Fed. Cas. No. 10,851. * * * But, although the courts will use a discretion about assuming jurisdiction of controversies between foreigners in cases arising beyond the territorial jurisdiction of the country to which the courts belong, yet, where such controversies are communis juris,—that is, where they arise under the common law of nations,—special grounds should appear to induce the court to deny its aid to a foreign suitor when it has jurisdiction of the ship or party charged. The existence of jurisdiction in all such cases is beyond dispute. The only question will be whether it is expedient to exercise it. See 2 Pars. Shipp. & Adm. 226, and cases cited in notes."

The libelant, however, is an American citizen, and entitled to obtain redress for his injuries in a court of his own country having jurisdiction of the persons of the defendants. Considering the extent of the injuries, and the probable responsibility of the libelant himself by reason of provocation on his part, I award him as damages the sum of $4,500, and all costs, including the expenses of keeping the defendants, since they have been in the custody of the marshal.