## THE ESTER.

### (District Court, E. D. South Carolina. July 31, 1911.)

1. ADMIRALTY (§ 5*)—WHAT LAW GOVERNS—ALIEN SEAMAN ON FOREIGN SHIP.
   A German, on being duly enrolled and signing articles as a seaman on a Swedish ship, became for the time being, for all purposes of consideration by the courts of the United States in his relations to the ship, a subject of the Kingdom of Sweden.
   [Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 5.*]

2. ADMIRALTY (§ 6*)—VESSELS IN FOREIGN PORT—LAW GOVERNING.
   The merchant vessels of one country visiting the ports of another country for the purposes of trade subject themselves to the laws which govern the port they visit so long as they remain.
   [Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 6.*]

3. ADMIRALTY (§ 5*)—JURISDICTION—FOREIGN VESSELS.
   In the absence of treaty stipulations, the courts of admiralty have civil jurisdiction in all matters appertaining to a foreign ship while in port, and also in certain cases when the court has the vessel in its territorial jurisdiction, although the cause of action arose on the high seas.
   [Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 69–85; Dec. Dig. § 5.*]

4. ADMIRALTY (§ 5*)—JURISDICTION—CONTROVERSIES BETWEEN FOREIGN VESSELS AND SUBJECTS—DISCRETION.
   The exercise of civil jurisdiction by courts of admiralty of the United States, where those concerned are all citizens of the same foreign state and the cause of action arose on or with regard to a ship of such state, is not imperative but discretionary, and where the controversy involves matters arising beyond the territorial jurisdiction of this country, or relates to differences between master and crew, or the crew and shipowners, the court, on general principles of comity, will not take jurisdiction unless there is special reason for doing so, and will require the consul of such country to be notified, and, although not absolutely bound by, will pay respect to, his wishes. But where special circumstances exist, as where the voyage is ended or seamen have been dismissed or treated with great cruelty, the courts, in the absence of treaty stipulations, will entertain jurisdiction, even against the protests of the consul.
   [Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 69–85; Dec. Dig. § 5.*]

**5.** ADMIRALTY (§ 5*)—JURISDICTION—FOREIGN SHIPS—EFFECT OF TREATY PRO-VISIONS.

Where treaty stipulations exist with regard to the right of the consul of a foreign country to adjudge controversies arising between the master and crew of ships of such country or other matters occurring on the ship, such stipulations are the law of the land and must be faithfully and fairly observed.

[Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 5.*]

**6.** TREATIES (§ 11*)—CONFLICT BETWEEN TREATY AND STATUTE.

Congress has power to regulate matters affecting foreign seamen and foreign vessels, and foreigners generally, when within the ports of this country, by making their entrance subject to such conditions as it may impose, or wholly withdrawing its consent to permit them to enter, and, where it has passed an act which may conflict with prior treaty stipulations, it is the duty of the courts to uphold the later statute if clear and explicit, even in contravention of express stipulations in an earlier treaty.

[Ed. Note.—For other cases, see Treaties, Cent. Dig. § 11; Dec. Dig. § 11.*]

**7.** ADMIRALTY (§ 5*)—DISCRETIONARY JURISDICTION—FOREIGN VESSELS AND CREWS.

What circumstances will influence a court of admiralty to take juris-diction of a suit between a foreign seaman and a foreign vessel, in the absence of applicable treaty stipulations, over the protest of the consul of the country to which the vessel belongs, is a matter to be determined on the particular facts of each case.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 69-85; Dec. Dig. § 5.*]

**8.** ADMIRALTY (§ 5*)—JURISDICTION—FOREIGN SHIPS AND CREWS—TREATIES.

Where special treaty stipulations exist with a foreign country which on their face exclude the jurisdiction of a court of admiralty over a cause and vest it in a consul of such country, the court is not empowered to proceed and take jurisdiction because there is no such consul within the district nor because of any other special circumstances.

[Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 5.*]

**9.** ADMIRALTY (§ 5*)—JURISDICTION—FOREIGN VESSELS—TREATY PROVISIONS.

Rev. St. §§ 4079-4081 (U. S. Comp. St. 1901, pp. 2766, 2767), which provide the mode by which foreign consuls shall exercise the exclusive ju-risdiction vested in them by special treaty stipulations in controversies between masters and crews of foreign vessels, do not affect the force of the treaty provisions excluding the admiralty courts from jurisdiction in case a consul does not follow such mode.

[Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 5.*]

**10.** ADMIRALTY (§ 20*)—JURISDICTION—CONSTRUCTION OF TREATY—"DIFFER-ENCES" BETWEEN OFFICERS AND CREW.

Under the provisions of the treaty of July 4, 1827, between Sweden and Norway and the United States (8 Stat. 352, art. 13), and that of June 1, 1910, between Sweden and the United States, both of which vest in the consular officers of each country exclusive jurisdiction to hear and determine "differences" which may arise between the officers and crews of merchant vessels of such country either at sea or in port without interference by the local authorities unless in case of breach of the peace, etc., a court of admiralty of the United States is without juris-diction of a suit by a foreign seaman on a Swedish vessel against such

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

vessel based on the alleged negligence of the master by which libelant was injured in an American port and compelled to leave the vessel.

[Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 20.*

For other definitions, see Words and Phrases, vol. 3, p. 2064.

Admiralty jurisdiction of suits between foreigners, see note to 37 C. C. A. 193.]

11. ADMIRALTY (§ 5*)—JURISDICTION—FOREIGN VESSELS—RULE OF COMITY.

Assuming that such treaties do not exclude the jurisdiction of a court of admiralty absolutely, but that it may assume such jurisdiction in its discretion, it should not do so over the objection of a Swedish consul indorsed by the minister from that country.

[Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 5.*]

In Admiralty. Suit by Hubert Jacob Osterkamp against the Swedish steamship Ester. On petition to dismiss. Petition granted.

N. B. Barnwell and C. D. Schroder, for libelant.

Huger & Wilbur, for respondents.

SMITH, District Judge. This is a libel in rem against a foreign steamship, brought to recover unpaid wages to the amount of $174.55, and in addition thereto damages for personal injury to the amount of $5,000. The respondents, the owners of the ship, have intervened herein, appearing especially to raise the question of jurisdiction, and have filed a sworn petition, accompanied by affidavits and certificates, and have further filed exceptions to the libel, claiming that the matters therein stated are not within the jurisdiction of this court. Upon the libel and this petition, with the accompanying affidavits and certificates and these exceptions and the answer to the petition, a motion has been made to dismiss the cause for lack of jurisdiction, and the case has been heard upon this motion. The facts appear to be as follows: The steamship Ester is a Swedish steamship, sailing under the flag of the Kingdom of Sweden, and is owned by a corporation or company styled the Angfartygsaktiebolagat Karin, which is, and all the members of which are, citizens of the Kingdom of Sweden. This Swedish steamship, whilst lying in the port of Nordenham, in the German Empire, and destined on a voyage to Charleston, S. C., and thence to some further ports as might be deemed expedient, until it should arrive at some port in the Kingdom of Sweden, enrolled the libelant, Osterkamp. Osterkamp, it appears, signed the articles of the ship in due form and went on the ship and served in pursuance thereof. At the time of signing these articles, he was a citizen of the German Empire and under the age of 21 years, and therefore a minor by the laws of the state of South Carolina. The vessel arrived at the port of Charleston, and whilst in that port, lying at her dock at one of the wharves in that port, the libelant, while in performance of his duties on the ship, fell through an open coal chute into a coal bunker, severely injuring himself thereby, in consequence of which he was sent by the master of the ship to a hospital in the city of Charleston. While he was confined in the hospital, the vessel departed from the port of Charleston, leaving the libelant in the hospital, and after visiting various ports in

the United States, returned to the port of Charleston, where she was at the time she was libeled herein. It appears that there is no Swedish consul or vice consul or consular agent or office within the port of Charleston or the territorial jurisdiction of the district of South Carolina, and the relations between the vessel and Osterkamp have been severed.

The petition of the shipowners sets up that, the vessel being a Swedish vessel, and owned by Swedish citizens, the libelant, when he became enrolled as a seaman on that vessel, became for the time being, so long as his term of service lasted, a citizen, and subject of the Kingdom of Sweden, and that, this matter being a question of difference between the master of a Swedish vessel and a citizen and subject of that Kingdom as a seaman on that vessel, under the treaty stipulations between the United States and the Kingdom of Sweden, this court has no jurisdiction, and that, even if it had jurisdiction, as a matter of comity it will not exercise that jurisdiction where the Swedish consul protests against the exercise by the court of any jurisdiction in this case. The petition further alleges that there is a certain declaration between the government of the King of Sweden and the government of the Emperor of Germany concerning assistance to destitute seamen, which provides that whenever a seaman belonging to one of the contracting parties, after having served on board the vessel of the other contracting party, is left behind in a third state or its colonies, and the said seaman is in a condition of distress, then the government on board of whose vessel the seaman has served is bound to support him until he again enters into a ship's service or finds other employment or until he arrives in his native country, or dies. The consul for Sweden in New York certifies to the court that the matter of the adjustment of this controversy and the performance of these treaty provisions between Germany and Sweden is in course of correspondence between the consuls of those countries, and that it is the desire of the consulate that the provisions of this declaration should be availed of and that the seaman Osterkamp be returned to Germany according to the requirements of the declaration. In addition to that, there is presented to the court a letter from the Swedish minister at Washington, asking that the request of the consul for Sweden in New York be granted.

[1] On the other hand, the German consul residing in the city of Charleston, state of South Carolina, denies that the matter of adjustment of this controversy and of the treaty provisions between Germany and Sweden is in correspondence between the consuls of the respective countries, and requests this court to take and hold jurisdiction of the cause and administer such justice and relief as Osterkamp may be entitled to upon his claim. This application of the German consul may be disregarded. When Osterkamp was duly enrolled as a seaman on a Swedish vessel, and signed the articles of employment on that vessel, he became for the time being, for all purposes of consideration by the tribunals of this country in his relations to the ship, a citizen of the Kingdom of Sweden. Ross v. McIntyre, 140 U. S. 453, 11 Sup. Ct. 897, 35 L. Ed. 581; The Marie (D. C.) 49 Fed. 288.

The case presented, therefore, is the case of a controversy based

upon a claim of a citizen of the Kingdom of Sweden for damages received by him on a ship belonging to the Kingdom of Sweden, whilst in the performance of his duties as a seaman duly enrolled on that ship, and caused by the negligence of the master of that ship, also a citizen of Sweden. The libel states that the injuries were caused by the carelessness and negligence of the master of the vessel, in that libelant was required and directed in pursuance of the commands of the master to pass through a dark and narrow passageway between the decks of the vessel, in the discharge of his duty, in which passageway was situated the coal chute down which libelant fell, which coal chute should have been closed, but was carelessly and negligently left open and unguarded and unlit by the master. Has this court jurisdiction of such controversy? And, if so, is that jurisdiction imperative or discretionary? And, if the latter, do the circumstances of this case call for its exercise?

The general rule of international law is stated in the Digest of the International Law of the United States, edited by Francis Wharton, and published by the government (volume 1, p. 130), to be that:

"So far as regards acts done at sea before her arrival in port, and acts done on board in port by members of the crew to one another, and so far as regards the general regulation of the rights and duties of those belonging on board, the vessel is exempt from local jurisdiction; but if the acts done on board affect the peace of the country in whose ports she lies, or the persons. or property of its subjects, to that extent that state has jurisdiction."

This rule as so stated, however, has been modified by the decisions of the Supreme Court of the United States.

In Ex parte Newman, 14 Wall. 150, 20 L. Ed. 877, the court, in the course of the delivery of its opinion (although the point was not involved in the question actually decided), states, on the question of a libel by a Prussian seaman against a Prussian vessel for wages, that admiralty courts, it is said, will not take jurisdiction in such a case except where it is manifestly necessary to do so to prevent a failure of justice; but the better opinion is that, independent of treaty stipulations, there is no constitutional or legal impediment to the exercise of jurisdiction in such a case. Such courts, may, if they see fit, take jurisdiction in such a case; but they will not do so as a general rule without the consent of the representative of the country to which the vessel belongs, where it is practicable that the representative should be consulted. His consent, however, is not a condition of jurisdiction, but is regarded as a material fact to aid the court in determining the question of discretion whether jurisdiction in the case ought or ought not to be exercised. This and the succeeding cases in which the subject has come up for an opinion in the Supreme Court of the United States appear to have established the following rules:

[2] (1) The merchant vessels of one country visiting the ports of another for the purposes of trade subject themselves to the laws which govern the port they visit, so long as they remain. United States v. Diekelman, 92 U. S. 520, 23 L. Ed. 742; Wildenhus' Case, 120 U. S. 11, 7 Sup. Ct. 385, 30 L. Ed. 565.

[3] (2) In the absence of treaty stipulations, the courts of admiralty have civil jurisdiction in all matters appertaining to the foreign ship while in port, and also in certain cases when the court has the vessel in its territorial jurisdiction, although the cause of action arose on the high seas. The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152; Wildenhus' Case, 120 U. S. 1, 7 Sup. Ct. 385, 30 L. Ed. 565.

[4] (3) The exercise of this civil jurisdiction, where those who are concerned are all citizens of the same foreign state and the cause of action occurred on or with regard to the ship, is not imperative, but discretionary, and the courts from motives of convenience or international comity will not take jurisdiction without the assent of the consul of the country to which the ship belongs, where the controversy involves matters arising beyond the territorial jurisdiction of this country, or relates to differences between the master and the crew, or the crew and the shipowners. In such cases on such general principles of comity, the admiralty courts of this country will not interfere between the parties, unless there is special reason for doing so, and will require the foreign consul to be notified, and although not absolutely bound by, will always pay respect to, his wishes as to taking jurisdiction. Ex parte Newman, 14 Wall. 152, 20 L. Ed. 877; The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152; Patterson v. Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002.

(4) Where, however, special circumstances exist, such as where the voyage is ended, or the seamen have been dismissed or treated with great cruelty, the courts, in the absence of treaty stipulations, will entertain jurisdiction, even against the protest of the consul. The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152.

[5] (5) Where treaty stipulations exist, however, with regard to the right of the consul of a foreign country to adjudge controversies arising between the master and the crew, or other matters occurring on the ship exclusively subject to the foreign law, such stipulations are the law of the land, and must be fairly and faithfully observed. The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152; Wildenhus' Case, 120 U. S. 17, 7 Sup. Ct. 385, 30 L. Ed. 565.

[6] (6) Congress has power by legislation to regulate matters affecting foreign seamen and foreign vessels and foreigners generally when within the ports of this country by making their entrance subject to such conditions, as Congress may seek to impose or withdrawing its consent to permit them to enter wholly, if it see fit. Patterson v. Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002.

(7) Where Congress has passed an act which may conflict with prior or treaty stipulations, it is the duty of the court to uphold the later statute if clear and explicit, even in contravention of express stipulations in an earlier treaty. Fong Yue Ting v. United States, 149 U. S. 720, 13 Sup. Ct. 1016, 37 L. Ed. 905; Patterson v. Eudora, 190 U. S. 178, 23 Sup. Ct. 821, 47 L. Ed. 1002.

The decisions of the lower federal courts in the United States have been many, but it is difficult to draw any uniform, logical rule from them.

Consideration of these cases shows that they may be said to fall within the following four classes or categories:

First. This class includes cases in which it has been held that the courts of admiralty have the right to take jurisdiction in the absence of special treaty stipulations in controversies between foreign seamen and foreign vessels, whether arising on the high seas or in the port, and whether based on tort or for wages. That this jurisdiction is not compulsory, but is discretionary. That this discretion will not be exercised against the protest of the consul of the country to which the vessel belongs, except under special circumstances. Where these special circumstances exist, however, the jurisdiction will be exercised, notwithstanding such protest. The Becherdass, 1 Low. 569, Fed. Cas. No. 1,203; The Lilian M. Vigus, 10 Ben. 385, Fed. Cas. No. 8,346; Boult v. Ship Naval Reserve (D. C.) 5 Fed. 209; The Carolina (D. C.) 14 Fed. 424; Fry v. Cook, Id.; The Montapedia (D. C.) 14 Fed. 427; The City of Carlisle (D. C.) 39 Fed. 807, 5 L. R. A. 52; Camille v. Couch (D. C.) 40 Fed. 176; The Topsy (D. C.) 44 Fed. 631; The Sirius (D. C.) 47 Fed. 825; The Karoo (D. C.) 49 Fed. 651; The Walter D. Wallet (D. C.) 66 Fed. 1011; Bolden v. Jensen (D. C.) 70 Fed. 505; The Lamington (D. C.) 87 Fed. 752; The Eudora (D. C.) 110 Fed. 430; The Kestor (D. C.) 110 Fed. 432; The Troop (D. C.) 118 Fed. 769; The Alnwick (D. C.) 132 Fed. 117; The Ucayali (D. C.) 164 Fed. 897.

It appears that there are no special treaty stipulations between this country and Great Britain. The Ucayali (D. C.) 164 Fed. 899; The Bound Brook (D. C.) 146 Fed. 163; The Troop (D. C.) 117 Fed. 557; The Walter D. Wallet (D. C.) 66 Fed. 1011. All the above-mentioned cases are cases of British vessels, with the exception of the case of Bolden v. Jensen (D. C.) 70 Fed. 505, which was the case of a Chilian vessel, and as to which case it is not said whether there were any special treaty stipulations or not.

[7] There is no defined rule as to the special and particular circumstances which in this class of cases has induced the court to take jurisdiction, notwithstanding the protest of the consul. In The Becherdass they were stated to be such as where the voyage ends by its own terms, and the wages are due in the jurisdiction where the suit is brought, or where the voyage has been wholly broken up by the sale of the ship, or where the ship is so unseaworthy that the crew are not bound to go in her, or where they have been forced to leave by the cruelty of the master. In The Lilian M. Vigus, the court held that it was a matter to be determined upon the circumstances of each particular case; that in that case none of the libelants belonged to Nova Scotia, where the ship belonged; that several of them were from different European countries; that their connection with the ship had been actually severed; that the future destination of the ship was wholly uncertain; that libelants had no certainty of relief if remitted to the foreign jurisdiction, as they had not their domicile there; and that to send them to Halifax for the prosecution of their claims at that late day would be practically to deny their claims altogether. In The City of Carlisle the circumstance relied upon by the court was that to decline the

jurisdiction woud be equivalent to a denial of justice; the libelant was separated from the vessel; his condition and the circumstances justified him in leaving her; that the vessel was not expected to reach her home port for many months yet; and that it was shocking to think of turning a poor helpless boy out of the court in a civilized country without redress for a grievous wrong, upon the theory that he had a remedy in the courts of his own country, when it was apparent that however just may be the laws of such country, or impartial their administration, such remedy is under the circumstances to him utterly unavailing. In The Topsy the court held that when the circumstances of the case are such as to demand immediate investigation, or when a seaman discharged from a ship will be put to disadvantage were she suffered to depart, or when she has departed would be compelled to search the world for her, the court would proceed with the case. In The Sirius the jurisdiction of the court was upheld upon the ground that the court would not turn the libelants away without any practicable remedy for what they claimed to be a grievous wrong, inasmuch as the future movements of the vessel were uncertain and her probable return to England remote. In Bolden v. Jensen the court held that, although the injury was inflicted on the high sea on board a foreign ship, it was the duty of the court of admiralty, which for such cases is a court of the world, to administer justice. In The Troop, 118 Fed. 769, the court held that courts of admiralty are obliged to serve to a certain extent as courts of the world, and that in that case it would have been an inexcusable denial of justice to leave the libelant, who was a German, to go to England to seek in the courts of that country enforcement of his rights, as the Troop might not visit any port of England for many years, and even were the libelant to meet her in an English port he would be unable to establish his rights because all the witnesses upon whom he must depend to prove the facts would be absent, and that the British consul residing at Port Townsend and at Tacoma had disclaimed authority to adjudicate libelant's claim for damage. In The Ucayali it was placed upon the ground that the court would entertain jurisdiction in all cases where seamen have been dismissed or treated with great cruelty.

A review of these decisions discloses no uniform rule for the guidance of the court. The circumstances under which the court will act where it has jurisdiction, and that jurisdiction is discretionary, is not limited in these cases, as indicated by the Supreme Court of the United States in The Belgenland, to cases where the voyage is ended, or the seamen have been dismissed or treated with great cruelty; but the discretion is declared to be properly exercised in all cases in which the court may be of the opinion, under the circumstances of the particular case, that it would work hardship or injustice not to take jurisdiction, whether with the assent or against the protest of the consul of the nation to which the ship belongs. This conclusion practically leaves the matter in a position in which upon any application the court must to a certain extent hear the case on the merits. In order to ascertain whether the special circumstances exist in any particular case that would lead the court to take jurisdiction, it would be neces-

sary to go into an examination sufficient at least to disclose in a general way those circumstances and the respective positions of the parties.

Second. The second class of cases are cases in which the courts have held that notwithstanding there are treaty stipulations, apparently excluding the jurisdiction of the court, yet that the court is at liberty to ignore these stipulations and take jurisdiction where there are special circumstances. The Elwin Kreplin, 4 Ben. 413, Fed. Cas, No. 4,427; The Amalia (D. C.) 3 Fed. 652; The Salomoni (D. C.) 29 Fed. 534. In The Elwin Kreplin the jurisdiction was put upon the circumstance of hardship, such as where the sailors who brought the proceedings would have been left paupers and must have returned to Prussia, and there awaited the return of the ship in order to enforce their demands, bringing about a state of things against which the sense of justice of the court revolted. This decision of the District Court in admiralty, however, was overruled by the Circuit Court in the case of the same title in 9 Blatch. 438, Fed. Cas. No. 4,426. In The Amalia the jurisdiction, notwithstanding the treaty stipulations between the United States and Sweden, was placed upon the ground that there was no consul or other officer of Sweden within the territorial jurisdiction of the court, and in the case of The Salomoni, where special treaty stipulations existed with the Kingdom of Italy, the right of the court of admiralty to take jurisdiction was placed upon the same ground as existing where there was no consul or other officer of the nation to which the ship belonged within the territorial jurisdiction of the court. There is no case later than The Salomoni (D. C.), in 29 Fed. 534, which holds the rule announced in this class of cases. The reasoning on which these cases rest is that the treaty contemplates that there shall be a consular officer to exercise the jurisdiction reserved to him. If there is no such consular officer; then the tribunal provided by the treaty fails, and with it should fail the application of the treaty stipulations. The exclusion of the jurisdiction of the local court is supposedly intended only in favor of the special tribunal provided by the treaty. If there is no such special tribunal, then there would be absolutely no court or person to whom the applicant could apply for justice and relief unless the treaty be interpreted to mean that the local court is not deprived of jurisdiction if the office specified in the treaty is not within the reach of the applicant, and that it is the duty of the country under the terms of such a treaty to provide accessible officers to exercise the jurisdiction or leave the matter to the proper local courts.

Third. The third class is that of cases in which it is held that, where the existing treaty stipulations upon the face of them exclude the jurisdiction of the court, such treaty stipulations are to receive faithful observation, and the court cannot take jurisdiction. The Elwin Kreplin, 9 Blatchf. 438, Fed. Cas. No. 4,426; The Burchard (D. C.) 42 Fed. 608; The Marie (D. C.) 49 Fed. 286; The Welhaven (D. C.) 55 Fed. 80; The Bound Brook (D. C.) 146 Fed. 160; Tellefsen v. Fee, 168 Mass. 188, 46 N. E. 562, 45 L. R. A. 481, 60 Am. St. Rep. 379. These cases are none of them cases referring to British vessels, but all referring to Prussian, German, Norwegian, or Swedish vessels,

between which countries and the United States special treaty stipulations exist. The decisions in these cases appear to be logical and to furnish an uniform rule. As the law as held by the Supreme Court of the United States is that a treaty with a foreign country is a supreme law of the land, and should be faithfully observed until it terminates, or is repealed or superseded by an act of Congress or another treaty, then it is the logical sequence that no court would have the right to ignore the treaty provisions because of inconvenience thereby caused to the suitor. If there be no consul within the immediate territorial district jurisdiction of the District Court of admiralty, the suitor can apply to the nearest consul in another judicial district of the United States in which such officer may be found, and his inconvenience in having to make that application, or to defer it until he returns to his native country, i. e., the country to which the vessel belongs, would not appear to be a sufficient authority for a court to ignore the treaty stipulation. In the case of Tellefsen v. Fee, the Supreme Judicial Court of Massachusetts held that under the terms of the treaty between the United States with Sweden and Norway all right of action for wages in the courts of this country by a seaman coming within the scope of the treaty was taken away, whether the action be in rem or in personam. That the court had no discretion in the matter, and the local authorities had no right to interfere.

Fourth. There are also cases which have gone to the length of holding that where the proceedings are brought on behalf of an American citizen, although they may be brought against a foreign vessel, and brought by reason of libelant's having served as an enlisted seaman on that vessel, yet that under the Constitution of the United States he has a constitutional right to invoke the jurisdiction of the court, of which he cannot be deprived either by treaty stipulation or act of Congress. Bolden v. Jensen (D. C.) 70 Fed. 505; The Falls of Keltie (D. C.) 114 Fed. 357; The Troop (D. C.) 117 Fed. 557; The Neck (D. C.) 138 Fed. 144. All these last four decisions are by the District Court for the District of Washington. The conclusion arrived at in these later cases appears to be in direct conflict with the principle that a seaman duly enrolled upon a foreign vessel is for the time being, and with regard to his employment on that vessel, a citizen of the same country as that to which the vessel belongs.

[8] From a consideration of the decisions in all these cases in connection with the conclusions reached by the Supreme Court of the United States, it would appear to be the better rule of law that, where special treaty stipulations exist which would upon the face of them exclude this court from jurisdiction in a cause such as the present one, it is not empowered to proceed and take jurisdiction because of any special circumstances in the particular case, as the absence from the district of South Carolina, in which the court is sitting, of a consul or consular agent or officer of the country to which the vessel belongs (and a fortiori not where a consul of the country actually appears and protests, although not resident in the district), or of any other special circumstances, such as brutality exercised towards the seamen, and the fact that if jurisdiction were not taken, and relief given by the court,

it might leave the applicant practically penniless. If the treaty stipulation is the law, it is to be followed by the court under all circumstances. However shocking to our sense of humanity and justice may be the apparent consequences to the seamen of brutality and indifference to their rights when shown by the master of a foreign vessel in port, it is not more cruel in reality than the exercise of such brutality and indifference upon the high seas or in the home port of the vessel, and provided it does not amount to a disturbance of the peace and the tranquility of the port in which the vessel is lying, or is the perpetration in the port of cruelty and maltreatment forbidden by law and which will be restrained and punished from a criminal aspect, there is no more reason on the ground of humanity alone for the courts of that state to take jurisdiction of a civil claim for indemnity, than there would be if it was exercised on the high seas or in the vessel's home port. If, therefore, by treaty it is stipulated that all the relations among and controversies between the crew including the master, officers, and seamen on board a foreign vessel, whether on the high seas or at a port in a foreign state, are to be treated as matters territorially within the jurisdiction of the country to which the vessel belongs, and to be remitted to the consuls, consular officers, or tribunals of that country, then it would not appear to be in the power of any court to disregard the law as embodied in the treaty stipulation because of the court's opinion that under the peculiar circumstances of the case the applicant will go bereft of justice unless this court awards it to him. The responsibility for such consequences rests upon the lawmaking, not the judicial, department of the government.

[9] The provisions of United States Revised Statutes, §§ 4079, 4080, and 4081 (U. S. Comp. St. 1901, pp. 2766, 2767), would not appear to affect the question. The intent of section 4079 is not to provide that, where by treaty exclusive jurisdiction is given over controversies between the master and any of the crew of a foreign vessel to the consular officer of the country to which the vessel belongs, such jurisdiction can be exercised only in the manner directed in sections 4080 and 4081, and if not so exercised the court of admiralty is not deprived of jurisdiction. The evident purpose of those sections is to provide a method whereby consular officers exercising jurisdiction under the stipulations of the treaty can enforce such jurisdiction and their orders in pursuance thereof. These sections do not infringe upon the treaty stipulations forbidding the exercise of jurisdiction to the local tribunal.

[10] Under this conclusion it is next to be determined whether the treaty stipulations between the United States and the Kingdom of Sweden exclude this court from taking jurisdiction of the case now before it.

The following are the treaty stipulations invoked by the petitioner and the Swedish consul:

Article 11 of the consular convention of June 1, 1910, between Sweden and the United States:

"The respective consuls general, consuls, vice consuls general, vice consuls, deputy consuls general, deputy consuls, and consular agents shall have ex-

clusive charge of the internal order of the merchant vessels of their nation, and shall alone take cognizance of any differences which may arise, either at sea or in port, between the captains, officers and crews, without exception, particularly in reference to the adjustment of wages and the execution of contracts. The local authorities shall not interfere except when the disorder that has arisen is of such a nature as to disturb tranquility and public order on shore or in the port, or when a person of the country or not belonging to the crew shall be concerned therein.

"In all other cases the aforesaid authorities shall confine themselves to lending aid to the said consular officers, if they are requested by them to do so, in causing the arrest and imprisonment of any person whose name is inscribed on the crew list whenever, for any cause, the said officers shall think proper."

Article 13 of the treaty of July 4, 1827, between Sweden and Norway and the United States:

"The consuls, vice consuls or commercial agents, or the persons duly authorized to supply their places, shall have the right as such to sit as judges and arbitrators in such differences as may arise between the captains and crews of the vessels belonging to the nation whose interests are committed to their charge, without the interference of the local authorities unless the conduct of the crews, or of the captain should disturb the order or tranquility of the country; or the said consuls, vice consuls or commercial agents should require their assistance to cause their decisions to be carried into effect or supported. It is however understood, that this species of judgment or arbitration shall not deprive the contending parties of the right they have to resort, on their return, to the judicial authority of their country." 8 Stat. 352.

Do these stipulations on the face of them exclude this court from taking jurisdiction of the present case? This depends upon the construction of the word "differences," as used in the treaties. Does that word cover the case of a tort, such as in the present case, where the claim is based upon personal injury arising from the alleged negligence of the captain? It is not the case of a malicious or cruel assault upon the person of the seaman by the master or any of the officers of the ship, or even any of his fellow seamen. It is not the case of cruelty in his treatment from starvation, bad provisions, or other maltreatment. It is a case of the claim of a seaman made for injury caused to him by falling down an unguarded chute or hatch in a vessel, which might have taken place on the open seas or elsewhere, as well as in the port. In the case of The Marie (D. C.) 49 Fed. 286, the court appeared to consider the word "difference" in this treaty as equivalent to covering all controversies. In the case of The Salomoni (D. C.) 29 Fed. 534, and of The Baker (D. C.) 157 Fed. 485, the court came to the conclusion that the word "differences" did not cover cases of personal tort under the general language of the Supreme Court on page 16 of 120 U. S. and page 389 of 7 Sup. Ct. (30 L. Ed. 565). In the Wildenhus' Case, above mentioned, it does not appear whether the Supreme Court at that time considered the word "difference" in similar treaties as covering controversies embracing personal torts. Inasmuch, however, as the rights of the seamen, based upon negligence shown towards him by the master in his management of his vessel, would appear logically to be a matter contemplated by a treaty—that is, that the country making the treaty would intend to hold that all claims of the seaman against the master for injury received by reason of the

management of his vessel by the master during the relation of master and seaman should be dealt with from the standpoint of the law and maritime discipline of that country—it seems a better view would be to read these stipulations to the effect that the word "differences" does include "controversies" based on torts in the sense of personal injuries occurring through the negligence of the master. Under this view the jurisdiction of this court would be excluded by the terms of the treaty.

[11] But assuming, as indicated by many of the cases above referred to, that this court has the discretionary power in exceptional cases (such as the absence from the district of any consul of the country to which the vessel belongs) of taking jurisdiction, notwithstanding the apparent meaning of the treaty stipulation, or assuming that the word "difference" does not include a controversy of the character set up in this libel, and such controversy is therefore not covered by the treaty in this case, under the general rule of comity as stated by the Supreme Court of the United States, and the circumstances for the exercise of the court's discretion, as relied on generally in the cases above referred to, should this court now take jurisdiction of the present case?

The claim of the libelant is that he was injured by a fall through an unguarded chute, which he attributes to the negligence of the master in leaving it unguarded. Under the principle decided by the Supreme Court of the United States in The Osceola, 189 U. S. 158, 23 Sup. Ct. 483, 47 L. Ed. 760, it is doubtful whether under these circumstances a seaman could recover indemnity (beyond maintenance and care) for the negligence of the master. It may be, however, that by the domestic law of Sweden such a recovery is allowed. By the law of South Carolina the libelant is a minor and entitled, according to the circumstances of the case, to consideration from that fact. It may be by the law of Sweden he is not so considered, and might be held at his age, under that law, to a greater or less degree of care on his own part. The Swedish consul sets up that under the declaration between the Kingdom of Sweden and the Empire of Germany this seaman is bound to be supported by the Kingdom of Sweden until he again enters the service of a ship, or finds other employment, or until he arrives in his native country, or dies. The Swedish consul in New York further certifies to this court that it is the desire of that consulate that the provisions of the declaration between Germany and Sweden shall be availed of, and that the libelant be returned to Germany, according to the terms of the declaration, and it is requested by the consulate that this court refuse to take jurisdiction of the present case. In addition, as has been stated, the minister of Sweden at Washington has presented to the court a request that the court accede to the request from the consul for Sweden in New York, which involves the taking care of the libelant, pursuant to the treaty stipulations between Sweden and Germany. In the face of this request of the Kingdom of Sweden itself, as transmitted in the request of its minister, and of the circumstances of this case, the court holds that, if it has discretionary power to take jurisdiction of this case, such discretion should not be exercised.

The court is not insensible to the argument that seamen are, of all classes in the community, perhaps the most helpless and unable

to protect themselves, and are most frequently the subject of gross injustice and maltreatment. As a rule the members of this class are practically penniless, and their vocation in life carries them far from home and friends at home. To say to a sick or helpless seaman from a foreign country, practically a pauper, and dependent on others, that he must transport himself to a distant state to present his claims to a consul of his own country, or that where he had been rendered a helpless cripple by the treatment he has experienced, or by misfortune and accident when in the performance of his duty on the ship, and has been abandoned as such at the nearest foreign port by the vessel on which he served, that he must transport himself back to the country to which the vessel belonged, to get redress and compensation, may seem a mockery, so far as the remedy given to him is concerned, as in most cases it would be practically hopeless for him to avail himself of it. On the other hand, for this very reason, because of the necessity that countries feel to look after their indigent and injured sailors, and the necessity likewise of preserving internal discipline and management on a ship between master and crew, according to the laws of such particular country, the rule of comity mentioned in Ex parte Newman has been maintained by the court, and it has been seen fit by many countries, in order to effect these general purposes, to reserve and by treaty to have reserved to them the entire control of such matters. The treaty making powers of the government have determined that the results of the observance of a general rule of this kind are more beneficial than the relief of humanity in particular cases. In the particular case before this court the failure by the court to take jurisdiction may work great hardship, but the possibility of such consequences is not for the court to consider if it be a matter of treaty, and if it be a matter of discretion then under the rule of comity this court should not assume that the libelant will not receive entire justice from the Kingdom of Sweden, whose representative now declares that his government both recognizes and desires to perform its obligations to the libelant.

A decree will be entered dismissing the libel, but ordering all costs to be paid by the petitioner, Angfartygsaktiebolagat Karin.